**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

**RUDOLPH J. GEIST, RJGLAW LLC, and RJGLAW LLC,**

　　　　Plaintiffs,

　　v.

**HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.**

　　　　Defendant.

Case No. 8:16-cv-3630

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**
**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Benjamin G. Chew (D. Md. Bar No. 14985)
Manatt, Phelps & Phillips, LLP
1050 Connecticut Avenue NW, Suite 600
Washington, DC 20036
Telephone:　　(202) 585-6511
Facsimile:　　(202) 585-6600
Email:　　　　bchew@manatt.com

*Counsel for Plaintiffs Rudolph J. Geist, RJGLaw
LLC, and RJGLaw LLC*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ..................................................................................2

I.    The Parties' Long-Standing Relationship in Spectrum Development for HITN and Negotiations Over the Services Agreement....................................2

II.   The Services Agreement ....................................................................3

III.  HITN Breaches the Services Agreement ................................................4

ARGUMENT ..........................................................................................................5

I.    RJG Has Stated a Claim Under the Plain Language of the Services Agreement ...............5

A.    The Services Agreement Provides an Entitlement to Payments Arising From Post-April 24, 2012 Contracts....................................5

B.    RJG Meets Each of the Requirements of the "Provided that" Clause in Seeking Payment for the T2 Transaction ............................15

1.    The Final T2 Transaction Resulted in Payments in "Forms Other Than Those Intended Under [Then-Existing] Agreements" ......................16

2.    The 2016 T2 Transaction Is "A Consequence of the Identification by [RJG] of Incremental Audit Revenue"..................................19

a.    The Services Agreement's Express Terms Only Require a But-For Causal Connection to Entitle RJG To Payment...............19

b.    Even Under a Proximate Cause Framework, RJG Has Properly Pled Its Entitlement to Payment Under the Services Agreement ................................21

3.    The Agreement Specifically Provides for Payment for Amounts Resulting From the Identification of Incremental Audit Revenue............27

C.    At a Bare Minimum, the Services Agreement Is Ambiguous, Which Precludes Resolution of Questions of Contract Interpretation on This Motion................................31

II.    RJG States a Claim Under the Implied Covenant of Good Faith and Fair Dealing .........33

i

III.     RJG's Declaratory Judgment Claim Is Not Duplicative of Its Contract Claim .................34

IV.     RJG's Unjust Enrichment Claims Do Not Improperly Duplicate Contract Claims..........34

CONCLUSION....................................................................................................................35

ii

## INTRODUCTION

Plaintiffs Rudolph J. Geist ("Geist"), RJGLaw LLC, and RJGLaw LLC (collectively "RJG") were hired to do a specific job—to maximize the value to be obtained from a proposed contract between Defendant Hispanic Information and Telecommunications Network, Inc. ("HITN") and a company called Clearwire Corporation (and its related entities) ("Clearwire"). In order to compensate RJG for this job, HITN specifically agreed to pay him 10% of any "additional payments" HITN received from the proposed transaction as a consequence of RJG's efforts. HITN was willing to pay this price because it had worked with RJG for nearly 20 years and completely understood the experience and expertise RJG brought to the table.

RJG did the job it was asked to do. As a direct result of RJG's work, HITN received a deal worth nearly $200 million more than that originally offered, saving the company from near financial ruin. Yet despite this incredible success, HITN now seeks to avoid the parties' bargain.

Contrary to HITN's arguments, the plain language of the Services Agreement specifically entitles RJG to the compensation it seeks. Indeed, RJG's interpretation is the *only* construction that gives meaning to every provision of the contract, that comports with the clear intent of the parties, and that pays proper heed to the applicable canons of contractual construction. As much as HITN tries, it cannot rewrite the plain contractual language that gives rise to its obligations.[1] Similarly, RJG's quasi-contractual claims are proper because they relate to HITN's bad-faith efforts to avoid its contractual obligations, *not* to actual breaches of those obligations. In short, the Services Agreement was created to provide the *exact entitlement to payment* that RJG now seeks, and HITN cannot reap the benefits of its bargain without also paying what is owed.

---

[1] At a bare minimum, the contract language is ambiguous and cannot be decided on this Motion.

1

## FACTUAL BACKGROUND

I.      **The Parties' Long-Standing Relationship in Spectrum Development for HITN and Negotiations Over the Services Agreement**

For nearly 20 years, RJG has worked with HITN to develop its spectrum portfolio. Second Amended Complaint ("SAC") ¶ 13.  Due to RJG's efforts, "HITN was able to increase its spectrum portfolio from 43 licenses to 90 licenses in 80 markets today, and it increased its annual revenues from spectrum leases to well over $10 million per year." *Id.*  Through RJG's experience and expertise, "HITN and its affiliates have acquired spectrum licenses currently worth hundreds of millions of dollars." *Id.*

Because of this expertise, HITN came to Mr. Geist in 2012 when it sought to renegotiate the terms of a number of its spectrum leases held by Clearwire.  SAC ¶ 20.  From the very beginning of their discussions, "Mr. Geist proposed receiving 10% of any cash equivalent net present value of any resulting transaction [involving HITN's spectrum], regardless of whether the transaction involved Clearwire or a different third party."  SAC ¶ 18.  HITN's representative "indicated that HITN was amenable to such an arrangement." *Id.* As negotiations progressed, HITN "informed Mr. Geist that they wanted him to advise HITN regarding the terms of [a] contemplated transaction with Clearwire to ensure that they were not missing out on valuable consideration or other opportunities."  SAC ¶ 20.  HITN "further informed Mr. Geist that time was of the essence because they had already agreed in principal to the economic terms of a deal with Clearwire, and HITN had to finalize the transaction as soon as possible because HITN required an influx of capital." *Id.*  This proposed transaction is known as the "T2 Transaction." *Id.*  "[D]ue to its dire financial condition at the time and near insolvency . . . HITN viewed

2

closing of the T2 Transaction as essential for the survival of the company." SAC ¶ 45.

As compensation for his work on the T2 Transaction, Mr. Geist proposed that RJG "receive at least 10% of any enhanced value of any deal his work facilitated." SAC ¶ 21. The parties then "agreed that Mr. Geist would receive 10% of any additional value he brought to HITN, above-and-beyond the terms HITN had currently negotiated with Clearwire." *Id.* This "proposed compensation arrangement was fully in line with Mr. Geist's standard arrangements with other holders of EBS spectrum licenses for whom he provided these services." SAC ¶ 22.

Despite the parties' verbal agreement, when Mr. Geist received a draft agreement from HITN, he "observed that the proposed agreement did not include the agreed terms by which Mr. Geist would receive 10% of any additional value HITN ultimately secured in finalizing the T2 Transaction." SAC ¶ 23. As a result, "Mr. Geist revised the draft agreement in redline and added language . . . to make his 10% entitlement clear." SAC ¶ 24. "Mr. Geist purposely added this language to the payment provisions found within Section (1)(b)(iii) of the proposed agreement because this section identified those services for which Mr. Geist would be entitled to 10% of any additional payments obtained from Clearwire." *Id.* Moreover, "Mr. Geist purposely highlighted and drew attention to this proposed addition by inserting it into the draft agreement in redline and prefacing it with the phrase 'provided that . . .' and inserting it specifically into the 'For the Avoidance of Doubt' section." *Id.* HITN signed the revised agreement. *Id.*

## II. The Services Agreement

As revised by Mr. Geist, the final Services Agreement, Section 1(b)(iii), contains two separate sentences. SAC ¶ 29. The first sentence provides Mr. Geist with payment of 10% of any "Incremental Audit Revenue" Mr. Geist identified as a result of his audit of *current*

3

agreements with HITN.  This sentence was part of the original language HITN sent to Mr. Geist.
*See* SAC ¶ 24.  The latter half of the second sentence, beginning with the phrase "provided that,"
contains Mr. Geist's insertion of his right to 10% of any additional payments generated by the
*future T2* Transaction as "a consequence" of Mr. Geist's work.  *See id.*  This section "was
specifically inserted to encapsulate the parties' express and agreed intention to provide Mr. Geist
with 10% of any additional value obtained by HITN in finalizing the T2 Transaction, as a result
of Mr. Geist's efforts."  SAC ¶ 30.

### III.     HITN Breaches the Services Agreement

After signing the Services Agreement, Mr. Geist began reviewing the proposed T2
Transaction and other HITN Agreements.  Mr. Geist reviewed the T2 Transaction and informed
HITN that the current price "vastly undervalued HITN's spectrum rights at issue in the
transaction."  SAC ¶ 44.  Despite this fact, "out of desperation to continue as a going concern,"
HITN was prepared to accept the offer, absent a different influx of capital.  *See* SAC ¶ 45.

"Within five days of HITN entering into the Services Agreement with RJGLaw, however,
Mr. Geist's audit services identified $3 million of unpaid lease payments Clearwire owed HITN
under some of its existing leases."  SAC ¶ 46.  In total, Mr. Geist's efforts resulted "in an
infusion of over $2 million from Clearwire within 90 days after engaging RJGLaw[.]"  *Id.*  "This
provided HITN with substantial and desperately needed financial support and enabled it to pause
the negotiation of the T2 Transaction with Clearwire in order to hold out for a better deal in the
future."  *Id.*  Mr. Geist had done his part—based on his efforts and identification of Incremental
Audit Revenue, HITN was no longer required to accept the poor deal offered by HITN and could
now wait for the opportune moment to consummate the transaction.  *See* SAC ¶¶ 46-47.

4

For the next three years, "essentially nothing happened with respect to furthering negotiations of the T2 Transaction." SAC ¶ 49. In fact, as of October 2015, "Mr. Geist learned that HITN had not engaged in T2 negotiations since they were paused in 2012." SAC ¶ 56. HITN simply sat on its nearly completed transaction and waited until the price was right. *See id.*

In June 2016, HITN concluded the T2 Transaction with Clearwire "at a price far greater than HITN would have received in 2012, but for Mr. Geist's identification of incremental audit revenue." SAC ¶ 61. Notably, other than the increased price (which was the point of pausing the deal in the first place), this was virtually the exact same deal with which RJG had assisted HITN in 2012. *See* SAC ¶ 61. The deal was between the same parties—HITN and Clearwire, SAC ¶ 59—and it contained a structure that "was substantially identical to the T2 Transaction proposed in 2012." SAC ¶ 61. As a direct result of Mr. Geist's identification of Incremental Audit Revenue, HITN now had the deal that it wanted at a price almost $200 million higher than that originally offered. *See id.* Mr. Geist did his job, just as he was asked to do. As a result, he is entitled under Section 1(b)(iii)'s second sentence to 10% of the additional payments Clearwire paid (or will pay) to HITN as consideration for the T2 Transaction that were not proposed or agreed prior to the Services Agreement. SAC ¶ 62.

## ARGUMENT

### I. RJG Has Stated a Claim Under the Plain Language of the Services Agreement

#### A. The Services Agreement Provides an Entitlement to Payments Arising From *Post*-April 24, 2012 Contracts

"The primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.'" *Sayers v. Rochester Tel.*

5

*Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993).[2]  "[I]t is a cardinal

rule of contract interpretation that a court must construe the terms of an agreement as a whole

and in a manner that gives effect to the mutual intent of the parties."  *Bank of N.Y. Trust, N.A. v.

Franklin Advisors, Inc.*, 522 F. Supp. 3d 632, 637 (S.D.N.Y. 2007).  Importantly, "courts should

attempt to read [contracts] in such a way that no language is rendered superfluous."

*Aeronautical Indus. Dist. Lodge 91 of Intern. Ass'n of Machinists and Aerospace Workers, AFL-

CIO v. United Tech. Corp.*, 230 F.3d 569, 576 (2d. Cir. 2000).  Where one contract interpretation

would render certain provisions "meaningless," that interpretation cannot be credited.  *Id.*

     Here, Section 1(b)(iii)'s second sentence, by its plain and unambiguous terms, provides

an entitlement to 10% of "additional payments" made to HITN that arose after the date of the

Services Agreement (April 24, 2012), when the contract's other requirements are met:

> ***provided that***, if HITN **[1]** receives additional payments from Clearwire that **[2]**
> have not been proposed or agreed prior to the date hereof **[3]** pursuant to
> agreements resulting from current negotiations, and **[4]** such additional payments
> are in forms other than those intended under original IUAs and other current
> agreements between HITN and Clearwire, but **[5]** such payments are a consequence
> of the identification by Geist of Incremental Audit Revenue, then **[6]** Geist shall be
> entitled to payment hereunder for the additional payments received by HITN.

     Under this provision's plain terms, Section 1(b)(iii) encapsulates payments to HITN that

arose from *future* agreements with Clearwire that were not yet in existence as of April 24, 2012.

First, Section 1(b)(iii) notes that RJG will be entitled to payment if "HITN receives additional

payments from Clearwire that have *not been proposed or agreed prior to the date hereof*."

(emphasis added).  This makes it clear that the payments must arise from some *future* agreement

between HITN and Clearwire.  Second, this provision provides that the payments at issue must

---

[2] The Services Agreement is governed by New York law.  *See* SAC Ex. A ¶ 7(d).

be "pursuant to agreements *resulting* from current negotiations." (emphasis added). By definition, if such agreements resulted from current negotiations, then they were not yet in existence at the time of those negotiations, *i.e.*, as of April 24, 2012. Third, Section 1(b)(iii) requires that "such additional payments are in forms other than those intended under original IUAs *and other current agreements between HITN and Clearwire***."** (emphasis added). Again, if the forms of payment must differ from those intended under current agreements between HITN and Clearwire, then they must be in forms contemplated by future agreements between the two. Taken together, these provisions unambiguously show that payments arising from future contracts consummated *after* April 24, 2012 fall within Section 1(b)(iii)'s payment provisions.

Nevertheless, in a futile effort to rewrite the plain terms of the parties' contract, HITN asserts that RJG's entitlement to payment under Section 1(b)(iii) "is limited to revenue identified … as due and owing under Clearwire Relationships that existed as of the date of the Services Agreement." Mot. at 8-9. Contrary to HITN's protestations, however, it is HITN's reading—*not* RJG's—that fails to comply with the contract's text, structure, and purpose.

*Text*. As discussed above, Section 1(b)(iii)'s second sentence specifically provides in *multiple places* that it applies to payments resulting from contracts not yet in existence as of April 2012. HITN does *not* actually dispute this fact. Instead, it essentially seeks to rewrite the contract by arguing that (a) Section 1(b)(iii)'s first sentence only applies to pre-2012 contracts and (b) the Court cannot rely on the second sentence's plain meaning because it begins with the phrase "for the avoidance of doubt." Mot. at 10. HITN's arguments cannot withstand scrutiny.

*First*, "[t]he rules of contract construction require [the Court] to adopt an interpretation which gives meaning to every provision of the contract." *GSI Commerce Solutions, Inc. v.*

7

*BabyCenter, L.L.C.*, 618 F.3d 204, 214 (2d Cir. 2010).  Under black letter New York law, "an interpretation of a contract that has the 'effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible."  *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992).  Thus, limiting Section 1(b)(iii)'s application to pre-2012 contracts would render the second sentence's express references to post-2012 contractual payments meaningless, and would violate the rules of contract construction.  *See Aeronautical Indus.*, 230 F.3d at 576 (refusing a contractual interpretation that "render[ed] the 'every effort' sentence superfluous by reducing the paragraph to an understanding informed by only the 'therefore' sentence").

Nor may HITN ignore the clear import of Section 1(b)(iii)'s second sentence merely because it begins with the phrase "for the avoidance of doubt."  This is not some magic phrase that allows HITN to close its eyes to the clear contractual language that follows.  To the contrary, this phrase must be interpreted just as with any other contractual provision—in accordance with the provision's plain meaning and without rendering it superfluous or meaningless.  *See Armco Inc. v. Glenfed Financial Corp.*, 746 F. Supp. 1249, 1261 (D. N.J. 1990).

In *Armco*, for example, the defendant argued that a phrase beginning with "for the avoidance of doubt," "create[d] no substantive rights in the parties" because it was only meant to clarify other provisions of the merger agreement at issue.  *See id.*  The court *rejected* this position.  The court refused to interpret the "avoidance of doubt" provision as "merely 'boilerplate'" because such a construction would be "contrary to the principle of contract construction that each term of an agreement is to be given meaning where possible."  *Id.*  The court found that the proposed interpretation would create a "meaningless provision," and instead held that it created new, substantive rights not previously provided by the agreement.  *See id.*

8

So too here.  HITN cannot write Section 1(b)(iii)'s second sentence out of the contract or refuse to acknowledge the substantive rights the sentence creates, merely because it begins with the phrase "for the avoidance of doubt."  At most, this phrase may create an ambiguity in the contract that will require extrinsic evidence to resolve.  But it does *not* allow HITN to resolve this matter on a motion to dismiss.  *See MDS (Canada), Inc. v. Rad Source Tech., Inc.*, 822 F. Supp. 2d 1263, 1301 (S.D. Fla. 2011) ("Instead of limiting doubt, the third sentence of Article 3.1 [beginning with "For the avoidance of doubt"] actually functioned to create additional doubt in the form of a latent ambiguity regarding the conveyance to MDS …."). [3]

**Second**, it is equally black letter law that "specific language in a contract will prevail over general language where there is an inconsistency between the two provisions." *GSI*, 618 F.3d at 214.  Thus, even if Section 1(b)(iii)'s first sentence generally refers to "payments … in respect of any Incremental Audit Revenue" without specifically referencing post-April 2012 contract payments, this general provision cannot be used by HITN to avoid the specific language contained in Section 1(b)(iii)'s second sentence. *Id.* ("Because GSI's construction of the broadly-worded standard language of the Addendum would strip the remainder of the Engagement Agreement of any meaning, it violates basic cannons of construction of contract law.").

At bottom, HITN's arguments regarding Section 1(b)(iii)'s second sentence miss the point.  By its explicit and unambiguous terms, this sentence sets forth a payment obligation that encapsulates payments received from post-2012 contracts between HITN and Clearwire.  As

---

[3] Nor do the cases cited by HITN militate otherwise. *See* Mot. at 10-11.  Those cases merely reviewed how the phrase "for the avoidance of doubt" affected the specific contractual language at issue and found that, in those particular cases, it was used to clarify the language that preceded it.  They did *not* state that the phrase could never introduce a new or different obligation.

such, it is irrelevant whether the sentence creates a new payment obligation to RJG not contained in the first sentence or merely clarifies that such an obligation was implicitly contained within the first sentence's more general language.  What matters is that, according to the contract's plain and unambiguous language, this payment obligation exists.  And no matter how hard HITN tries, it cannot write RJG's entitlement out of the Services Agreement.  *See McQuade v. McQuade*, 67 A.D.3d 867, 869 (N.Y. App. Div. 2009) (refusing to adopt a construction that "would render the alternate payment provision meaningless and illusory …. That provision must be given effect.").

*Structure*.  Interpreting the second sentence to entitle RJG to payment arising from post-2012 contracts between HITN and Clearwire is consonant with both the structure of Section 1(b)(iii) and of the Services Agreement as a whole.  To begin, Section 1(b)(iii)'s first sentence provides that when HITN receives payments "in respect of any Incremental Audit Revenue" identified by RJG, RJG is entitled to 10% of such payments.  The second sentence then begins: "For the avoidance of doubt, (a) the increase in payments under existing IUAs presently being negotiated with Clearwire are not Incremental Audit revenue…."  This clarifies that any increase in payments negotiated by HITN without RJG prior to the Services Agreement is *not* Incremental Audit revenue, thereby limiting RJG's fees to "additional payments" it might secure. The second sentence then continues: "(b) Geist shall not be entitled to payment for Consulting Services in respect of work performed in respect of Audit Services …."  This phrase explains that, *in general*, payments due to RJG for Audit Services are not also paid as Consulting Services.  Both of these provisions were originally inserted by HITN.

After setting forth parts (a) and (b), the second sentence (as inserted by RJG) then uses a semi-colon and the phrase "provided that" to create an *exception* to these two general rules:

10

> For the avoidance of doubt, (a) [limitation 1] … (b) [limitation 2]; ***provided that***, if HITN receives additional payments [satisfying certain criteria] … then [RJG] shall be entitled to payment hereunder for the additional payments ….

(emphasis added).  Thus, this second sentence serves to provide two general limitations to RJG's entitlement to 10% of additional payments for his "Audit Services," but then it also provides an exception to when those limitations apply.  If each of the criteria following the "provided that" language is met, then the exception applies.  At that point, RJG becomes entitled to "payment hereunder," *i.e.*, 10% of the "additional payments received by HITN."

This creation of an exception to HITN's two limitations answers both why this provision was placed within the "avoidance of doubt" section and why it was placed within Section 1(b)(iii) (for payment for Audit Related Services) in particular (as opposed to anywhere else in the contract).  Certainly, as HITN points out, the Services Agreement has a separate section providing for payment for "Consulting Services" at a rate of $400 per hour.  *See* Mot. at 11.  But the whole point of the "provided that" clause is to carve out a specific set of services for which RJG would be paid 10% of any additional value realized by RJG's work, *regardless* of the particular label applied.  RJG's creation of an exception to the "avoidance of doubt" section (including its limitation on "payment for Consulting Services in respect of work performed in respect of Audit Services") required this provision to be placed within Section 1(b)(iii) and *not* within that separate section related to hourly "Consulting Services."  SAC ¶ 24.

Moreover, a close reading of the "Consulting Services" section of the Services Agreement shows that Mr. Geist would *not* have been entitled to any payment thereunder for his work on the T2 Transaction.  Notably, Section 1(a)(i) of that section provides that the "Scope of Consulting Services" is limited to "reviewing and advising on particular aspects of the Clearwire

Relationships…. " As HITN itself notes, "'Clearwire Relationships' are defined as 'contractual relationships' that HITN 'has … with Clearwire Corporation.'"  *See* Mot. at 9.  Thus, under HITN's own definition, RJG would *not* be entitled to payment under the "Consulting Services" section for the T2 Transaction, because that work did not involve an existing relationship with Clearwire.  Similarly, Section 1(a)(i) provides that "Geist shall not provide any Consulting Services that are not specifically requested in writing by HITN or on its behalf."  HITN does not claim that it ever "specifically requested in writing" that RJG provide it with Consulting Services relating to the T2 transaction.  These definitions further show why the services governed by the "provided that" clause should be paid under Section 1(b)(iii) and *not* under the "Consulting Services" Section.  Otherwise, contrary to its arguments, HITN could create a whole category of services in relation to post-April 2012 contracts for which RJG's "alleged advice regarding the 2012 contract negotiation was rendered free of charge."  *See* Mot. at 11.

Nor is this payment obligation "buried" in the contract's "Audit Services" section as HITN argues.  *See* Mot. at 11.  To the contrary, it was purposely placed in Section 1(b)(iii) because that section identifies services for which Mr. Geist would be entitled to 10% of additional payments to HITN from Clearwire.  *See* SAC ¶ 24.  Mr. Geist further placed this provision within the "avoidance of doubt" section and highlighted the provision for HITN in redline to make the obligation clear.  *See id.*  HITN cannot discount RJG's purposeful choice to insert the language at issue specifically into Section 1(b)(iii) –the section that best exemplifies the payments sought—by describing that sentence as "buried" or "ill-fitting."  *See* Mot. at 11.  Rather, this language's placement shows the parties' intent to afford RJG the very payments it now seeks.  *See Fendley v. Power Battery Co.*, 167 A.D. 2d 260, 262 (N.Y. App. Div. 1990)

12

(finding that "the very placement of the clause under a rider to the Distributor Agreement" was "itself a strong indication" of the parties' intent in drafting the language at issue).

*Purpose*.  Reading this clause as applying to certain payments from post-2012 contracts is also consistent with the contract's purpose.  As described above, the contract used this provision to carve out a specific subset of services that would be excepted from the "avoidance of doubt" section and for which RJG would be entitled to 10% of any additional payments received by HITN as "a consequence" of the identification of Incremental Audit Revenue.  This exception encapsulates a subset of "Consulting Services in respect of work performed in respect of Audit Services," for which RJG's "Audit" and "Consulting" services might otherwise overlap.  So long as the requirements of the "provided that" clause are met, these services are characterized as "Audit Services" and entitled to "payment hereunder," even if they might otherwise have fallen into the "Consulting Services" section.  This clause therefore continues to distinguish between "Audit" and "Consulting" services, just *not* in the way HITN contends.

Further, RJG's interpretation of this language is the only construction that is consonant with the *objective, expressed* intent of the parties in drafting the Services Agreement.  Indeed, Mr. Geist "specifically inserted" the "provided that" clause into Section 1(b)(iii) "to encapsulate the parties' express and agreed intention to provide Mr. Geist with 10% of any additional value obtained by HITN in finalizing the T2 Transaction, as a result of Mr. Geist's efforts."  SAC ¶ 30; *see also id.* ¶¶ 18, 21, 24.  Mr. Geist "purposely highlighted and drew attention to this proposed addition by inserting it … in redline … and inserting it specifically in the 'For the Avoidance of Doubt' section."  SAC ¶ 24.  While HITN seeks to minimize the parties' *objective* intent, *see* Mot. at 12, HITN cannot, itself, raise the issue of the purpose of the agreement and then ignore

13

the SAC's explicit pleading regarding that very purpose.  Given the evidence of the parties'

explicit intent pled by RJG, the Court should not find the Services Agreement to be so

unambiguous as to frustrate the parties' purpose in drafting it.  *See, e.g. Williams Press, Inc. v.*

*State*, 37 N.Y.2d 434, 440 (NY 1975) ("The courts should then choose that construction which

will carry out the plain purpose and object of the indenture.'").

    ***Finally***, while RJG contends that the Services Agreement unambiguously entitles it to a

percentage of payments arising from post-2012 contracts, *at best*, HITN's arguments show an

ambiguity in the contractual language at issue.  *See Sayers v. Rochester Tel. Corp. Supplemental*

*Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (where "[b]oth parties offer

interpretations with a sound basis in the language of the [contract]," or where the contract "is

susceptible to more than one reasonable interpretation," the agreement is ambiguous).  "[T]he

construction of ambiguous contract provisions is a factual determination that precludes dismissal

on a motion for failure to state a claim."  *Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*,

978 F.3d 140, 142 (4th Cir. 1992); *Bank of N.Y.*, 522 F. Supp. 3d at 637 (same).

    Here, notably, HITN itself propounds two potentially reasonable interpretations of

Section 1(b)(iii) by, on the one hand, arguing that this section only applies to pre-2012 contracts,

and, on the other, that the "provided that" clause is not satisfied under the facts of this particular

case.  *Compare* Mot. at 8-13 *with id.* at 13-24.  If this clause unambiguously precluded pre-2012

contracts from falling within its ambit, then *no* post-2012 contract should be able to fit within its

terms.  Because HITN's later arguments (albeit incorrect) are all factually specific to the T2

Transaction, this implicitly recognizes that some post-2012 contracts *could* fit within the

parameters set by Section 1(b)(iii)'s second sentence.  HITN's two mutually exclusive

14

positions—at a minimum—show an ambiguity that "precludes dismissal on a motion for failure to state a claim." *See Martin Marietta*, 978 F.3d at 142.

**B.     RJG Meets Each of the Requirements of the "Provided that" Clause in Seeking Payment for the T2 Transaction**

Under the provisions of the "provided that" clause contained within Section 1(b)(iii)'s second sentence, the SAC alleges a contractual entitlement to 10% of the payments received (or to be received) by HITN in finalizing the T2 Transaction, above-and-beyond those previously negotiated by HITN and Clearwire prior to the Services Agreement.  Notably, HITN does *not* dispute that the SAC satisfies the clause's first three elements.  *See* Mot. at 13.  As such, HITN *concedes* that the T2 Transaction (1) involves additional payments from Clearwire that (2) had not been proposed or agreed prior to the date of the Services Agreement, and (3) which were pursuant to agreements resulting from then-current negotiations.  *See* SAC, Ex. A ¶ 1(b)(iii). HITN *only* disputes whether RJG has satisfied the last three prongs of the provision.

As discussed below, while HITN disputes these final three prongs, its objections are meritless.  First, the SAC clearly alleges that "the additional payments HITN received for the final T2 Transaction are in forms other than those intended under Original IUAs and other current agreements between HITN and Clearwire."  SAC ¶ 61.  Second, such payments were "a consequence of the identification by Geist of Incremental Audit Revenue" (either but for *or* proximate) because that identification led directly to HITN "paus[ing]" the T2 negotiations and "concluding" the transaction with a "substantially identical" structure, and with a price in line with that suggested by Mr. Geist in both 2012 and 2016.  SAC ¶¶ 46-47, 49, 56-59, 61.  Third, RJG's entitlement to "payment hereunder" entitles it to 10% of the difference between the final

15

value of the T2 Transaction and that proposed in 2012 because any other interpretation would render the "provided that" clause meaningless and superfluous.

Finally, while RJG submits that the Services Agreement plainly entitles it to the funds identified, at a bare minimum, the contractual language at issue is ambiguous.  This precludes resolution on a motion to dismiss and provides an independent basis for denying HITN's Motion.

> **1.     The Final T2 Transaction Resulted in Payments in "Forms Other Than Those Intended Under [Then-Existing] Agreements"**

Section 1(b)(iii)'s second sentence provides that the additional payments HITN receives must be "in forms other than those intended under original IUAs and other current agreements between HITN and Clearwire."  The SAC explicitly pleads this requirement.  It begins by describing the "forms of payments HITN received under the Original IUAs with Clearwire," which included a variety of monetary and nonmonetary forms of payment.  SAC ¶ 17.  It then alleges that "the forms of the additional payments HITN received in the final T2 Transaction consist solely of an upfront cash payment, regular fixed monthly lease payments, and some periodic lump sum payments."  SAC ¶ 61.  As a result, the SAC pleads that "[t]he additional payments HITN received for the final T2 Transaction are in forms other than those intended under the Original IUAs and other current agreements between HITN and Clearwire."  *Id.*

Despite this explicit and unambiguous adherence to Section 1(b)(iii), HITN argues that the SAC does not sufficiently allege that T2 Transaction payments differed in form from "other current agreements" and from the "original IUAs."  Mot. at 15-16.  This argument fails.

***First***, "even under the *Iqbal* standard . . . Rule 8 is still a notice pleading provision and a party's allegations need not be put to proof at the pleading stage."  *See, e.g.*, *Global Bankcard*

16

*Servs., Inc. v. Global Merch. Servs., Inc.*, No. 1:11-cv-00110, 2011 WL 2268057, at *4 (E.D. Va. June 7, 2011).  As such, "a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim." *CareFirst, Inc. v. Taylor*, No. CV CCB-16-2656, 2017 WL 75947, at *6 (D. Md. Jan. 9, 2017).  Similarly, "a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable[,]'" only that it is "plausible." *Id.*  Thus, even after *Iqbal*, a complaint need only "contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 246 (D. Md. 2016).

Here, the SAC specifically alleges that "[t]he additional payments HITN received for the final T2 Transaction are in forms other than those intended under the Original IUAs and other current agreements between HITN and Clearwire."  SAC ¶ 61.  The SAC then alleges that "the forms of the additional payments HITN received in the final T2 transaction consist solely of an upfront cash payment, regular fixed monthly lease payments, and some periodic lump sum payments," thereby noting the specific "forms" of payments that were different from those intended under the original IUAs and other current agreements.  *See id.*  Thus, the SAC explicitly alleges that the T2 Transaction contained payments in "forms" other than those intended by the original IUAs and other then-current agreements and provides a factual basis for that allegation. This is *all* that is required on a motion to dismiss.  *Global Bankcard*, 2011 WL 2268057, at *4.

HITN essentially criticizes RJG for not pleading the form of every single payment contemplated by every single agreement then in existence between HITN and Clearwire, but RJG is *not* required to plead that level of granular detail to plausibly state a claim for relief.  *See id.*  Understanding the futility of its argument, HITN seeks to distract from the facts as actually pled with incorrect and disingenuous characterizations of the procedural history of this case.  For

17

example, HITN argues that RJG failed to allege the necessary facts "despite having had three opportunities to do so." Mot. at 15. As HITN well knows, this Court has yet to rule on any of HITN's motions and has not yet evaluated RJG's pleading in *any* way.[4] Thus, even were the Court to require more detail (which the Court should *not*), RJG could easily add that detail in an amended pleading. HITN cannot use word games and semantics to prevent RJG from pleading the factual detail necessary to state its meritorious claims. *See Francisco v. Doherty, Sheridan & Grimaldi, LLP*, 178 F.3d 1283 (Table) (4th Cir. 1999) (abuse of discretion to deny leave to amend where amendment could "add[ ] significant detail to . . . allegations").[5,6]

Similarly, HITN seeks to use alleged inaccuracies in *other* previous allegations to somehow argue that RJG has not properly pled Section 1(b)(iii)'s "forms" requirement. *See* Mot. at 16. This argument is a *non-sequitur*. The fact that RJG voluntarily amended certain allegations based on materials provided after-the-fact by Defendants has nothing to do with whether RJG has the ability to plead separate claims for relief. HITN cannot short-circuit the trial process by requiring RJG to prove its claims on a motion to dismiss, and its reliance on such irrelevant facts shows the weakness of its arguments.

***Second*** (and while unnecessary to resolve this motion in RJG's favor), HITN bases its

---

[4] Moreover, in moving for leave to file the SAC, RJG took great care not to change a single allegation from that in the FAC, other than to remove a cause of action by agreement of the parties, so as to give the Court the opportunity to adjudicate that motion, if it chose to do so.

[5] In fact, RJG possesses information regarding all of the original IUAs and other then-current agreements with Clearwire. While RJG believes it unnecessary to state a claim, RJG could easily show that each contained forms different than those intended in the T2 transaction.

[6] Similarly, HITN argues that RJG's claims should be dismissed because RJG pled "Original IUAs" instead of "original IUAs." This is the type of semantic distinction that, while insufficient on its face, could also be easily remedied in an amended pleading.

18

arguments on a flawed definition of the term "forms" under the Services Agreement.  The term

"form" is defined as "the essential nature of a thing as distinguished from its matter" or the

"component of a thing that determines its kind."  Merriam-Webster Online Dictionary,

https://www.merriam-webster.com/dictionary/forms (last visited Feb. 7, 2017).  As such, the

purpose of this provision—requiring additional payments to be in "forms other than those

intended under [then-current] agreements"—is merely to clarify that RJG would not be

compensated for payments that were already covered by then-existing agreements.  *See* SAC ¶¶

29-30.  Thus, under a proper formulation of the term, a mechanical comparison between each

type of payment under each agreement (as HITN seeks to perform) is unnecessary.  As long as

the new agreement contains payment terms different in some way from those contained within

previous agreements, that is sufficient to meet this contractual provision.  Because this

requirement is easily met here, this provides an independent basis for denying HITN's Motion.[7]

> **2.      The 2016 T2 Transaction Is "A Consequence of the Identification by [RJG] of Incremental Audit Revenue"**
>
>> a.      *The Services Agreement's Express Terms Only Require a But-For Causal Connection to Entitle RJG To Payment*

Under Section 1(b)(iii), RJG must allege entitlement to payments that "are a consequence

of the identification by Geist of Incremental Audit Revenue."  Importantly, the contract only

requires such payments to be "a" consequence of the identification of Incremental Audit

Revenue, *not* "the" consequence of such identification.  *See id.*  This choice of the article "a" was

not accidental by the drafter, but instead connotes "broad language" that "mandates only a [but-

---

[7] At a minimum, this creates as an ambiguity as to the term "form" that precludes resolution on a motion to dismiss.  *See Martin Marietta*, 978 F.3d at 142

for] causation requirement." *See Murakami v. United States*, 398 F.3d 1342, 1351-52 (Fed. Cir. 2005); *see also Patrolmen's Benev. Ass'n of City of N.Y., Inc. v. City of N.Y.*, 46 A.D. 3d 378, 380 (N.Y. App. Div. 2007) ("every clause and word should be given meaning").

In *Murakami*, for example, the Federal Circuit construed the phrase "as a result of" in a federal statute to be "broad language" that applied "to individuals 'otherwise deprived of liberty' *as a consequence or effect of* governmental action." *Murakami*, 398 F.3d at 1351-52 (emphasis added).[8]  The court noted that "as the result of . . . mandates only a causation requirement," rather than the stricter language for which the government advocated. *See id.* at 1352.  In so holding, the court further approved of language rejecting the imposition of a "proximate cause requirement," noting that it went beyond the natural reading of the phrase. *Id.* ("the Government suggests that the 'as a result of' language of § 1151 signifies a proximate cause requirement that incorporates a fault test. *Once again, we find the suggestion implausible.*") (emphasis added). The court therefore analyzed the language at issue under this but-for causation framework. *Id.*

Here, properly construing Section 1(b)(iii)'s language (and just as in *Murakami*), the Services Agreement only requires additional payments to be "a consequence or effect" of the identification by RJG of Incremental Audit Revenue. *See Murakami*, 398 F.3d at 1351-52. Because the SAC alleges that RJG's identification of Incremental Audit Revenue directly resulted in HITN "paus[ing] the T2 Transaction" and then "concluding" the transaction under a "substantially identical" structure with minimal negotiations (and in consultation with Mr. Geist

---

[8] Under New York law, "[t]he rules for the construction of statutes are substantially the same as for the construction of contracts and other written instruments." *Genet v. President, Etc., of Del. & H. Calan Co.*, 163 N.Y. 173, 179 (1900); *see also Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*, 549 F. Supp. 2d 249, 273 (E.D.N.Y. 2008) (same).

in both 2012, 2015, and 2016), the payments HITN receives as a result of the consummated T2

Transaction easily fall within this definition.  *See* SAC ¶¶ 46-47, 49, 57-61.

While HITN seeks to avert this result by arguing that the Services Agreement requires

"proximate cause," rather than "but for" causation, s*ee* Mot. at 12-13, similar arguments have

*already* been rejected by the Federal Circuit in *Murakami*.  Further, while HITN argues that

"[c]ourts have applied this common law definition of 'causation' to contractual provisions

concerning 'consequences,'" *see* Mot. at 17-18, those cases dealt with different and more

constrictive contractual language in a far different context than that present here.  *See Libby,*

*McNeill & Libby v. United States*, 340 U.S. 71 (1950) (construing an insurance policy covering

"*all* consequences of warlike operations") (emphasis added).  These cases do *not* construe the

phrase with the modifying article "a," and therefore are of no help in interpreting the contractual

language at issue.  *See Five Star Dev. Resort Cmtys. LLC v. iStar RC Paradise Valley, LLC*, No.

09 Civ. 2085(LTS), 2012 WL 1003557, at *8 (S.D.N.Y. Mar. 26, 2012) (refusing to apply a

construction that would render "the modifying phrase meaningless" because "every clause and

word of a contract should be given meaning").  HITN's interpretation should be rejected.

> b.    *Even Under a Proximate Cause Framework, RJG Has Properly*
>        *Pled Its Entitlement to Payment Under the Services Agreement*

Even if the Court were to apply a proximate cause analysis in construing the Services

Agreement, this Motion should still be denied.  New York courts routinely recognize that

proximate cause "present[s] a question of fact for the jury," and thus generally should not be

decided on a motion to dismiss.  *Hughes v. Temple*, 187 A.D.2d 956, 956 (N.Y. App. Div. 1992)

("When varying inferences are possible, proximate cause presents a question of fact for the jury.

21

Thus, [the] Supreme Court properly denied defendant Temple's motions to dismiss."); *Avis Budget Car Rental, LLC v. JD2 Envtl., Inc.*, No. 12-cv-5010, 2016 WL 3251394, at *7 (E.D.N.Y. June 13, 2016); *Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortgage Capital, Inc.*, No. 11-cv-0505, 2011 WL 2610661, at *7 (S.D.N.Y. June 27, 2011); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 10 Civ. 5762, 2016 WL 3098842, at *6 (S.D.N.Y. June 1, 2016) ("Proximate cause is left to the factfinder unless 'there is no valid line of reasoning and permissible inferences which could possibly lead rational men' to find for the plaintiff on that issue.").

Further, "[t]o break the legal chain, the intervening act must have been 'of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." *NAF Holdings*, 2016 WL 3098842, at *6. In agreements "involving 'brokers,' 'finders,' and, even, 'matchmakers,' . . . [a]greements have been upheld [on causation grounds] which required only the most minimal connection." *See Bushkin Assocs. v. Raytheon Co.*, 815 F.2d 142, 151-52 (1st Cir. 1987). A mere "intervening lapse of time," even of years, is insufficient to break this causal connection, so long as a "continuing connection between plaintiff's initial efforts and the [eventual transaction]" exists. *See Simon v. Electrospace Corp.*, 28 N.Y.S.2d 136, 140-42 (NY. 1971).

In *Simon*, the New York Court of Appeals considered whether the plaintiff had the right to a commission for a merger that occurred approximately two and a half years after he was retained to assist in the sale, and approximately 18 months after the plaintiff ceased being involved in the negotiations. *See Simon*, 28 N.Y.S.2d at 140-43. Under the parties' contract, if the plaintiff "arranged" a sale of stock or merger with the defendant, the plaintiff would be entitled to "a fee of 5% of the gross value of the transaction." *Id.* at 139-40. The plaintiff then

22

"arranged meetings with several prospects," including the eventual partner with whom the

defendant merged. *Id.* at 140. A period of approximately 18 months passed since these

meetings, and the plaintiff was "kept in the dark about negotiations." *Id.* The merger was then

consummated without the plaintiff's involvement at that time. *See id.*

Nevertheless, the Court of Appeals affirmed the trial court's finding of liability. *See id.* at

142. In so holding, the court found that "[t]racing a connection between plaintiff's introduction

of the business and the termination of the entire transaction was for the jury's consideration." *Id.*

The court then affirmed the jury's finding of proximate cause, regardless of the amount of time

that had passed and the plaintiff's absence from the consummation of the transaction:

> Here there was a time lapse of about eighteen months between the first
> Robosonics meeting and the reactivation of the deal by Taxin's call to the new
> president. Tracing a connection between the two is supported by the facts and the
> reasonable inferences to be drawn therefrom and is not to be rejected because of
> the intervening lapse of time.

*Id.* Here, RJG has alleged more than sufficient facts to plausibly plead the "continuing

connection" between RJG's efforts and the ultimate transaction required for proximate cause.

Indeed, the SAC alleges that, in 2012, at or around the time HITN retained RJG, "out of

desperation to continue as a going concern, HITN had agreed to accept Clearwire's proposed

$84,787,500 offer, notwithstanding the fact that the price vastly undervalued HITN's spectrum

rights." SAC ¶ 45. Nevertheless, as a direct result of RJG's identification of over $2 million in

Incremental Audit Revenue, HITN received "substantial and desperately needed financial

support [that] enabled it to pause the negotiation of the T2 Transaction with Clearwire in order to

hold out for a better deal." SAC ¶ 46. Due to RJG's efforts, "HITN did pause the T2

Transaction negotiation with Clearwire" until it could receive a price that properly valued

23

HITN's spectrum rights.  SAC ¶ 47.  This was the *exact plan* RJG and HITN contemplated and

enacted as a result of RJG's identification of Incremental Audit Revenue.  SAC ¶¶ 44-47.  This

plan then came to fruition in 2016, when HITN entered into a deal that was "substantially

identical to the T2 Transaction proposed in 2012" (except for the price, which was the reason for

the "pause" in the first place).  SAC ¶ 61.  Just as in *Simon*, because RJG's identification of

Incremental Audit Revenue led directly to the very transaction contemplated by the parties, this

provides the "continuing connection" necessary for proximate cause, regardless of whether RJG

was "kept in the dark about [later] negotiations."[9]  *See Simon*, 28 N.Y.S.2d at 142-43.[10]

Ignoring the direct causal relationship between RJG's identification of Incremental Audit

Revenue and the consummation of the T2 Transaction, HITN argues that "[t]he $2 million that

RJG-MD allegedly identified in 2012" caused only "HITN's decision to terminate negotiations in

2012."  Mot. at 20.  This argument misunderstands the nature of the type of "matchmaker" or

"finders" contract at issue here.  The Services Agreement did *not* require RJG to negotiate the

deal between HITN and Clearwire.  Nor did it require RJG to advise HITN on each step along

the way.  Rather, the Services Agreement only required RJG to "identif[y]" Incremental Audit

---

[9] Notably, once negotiations did begin again in late 2015, early 2016, HITN repeatedly went back to Mr. Geist to seek his advice on the valuation of the T2 Transaction and how best to proceed.  *See* SAC ¶¶ 56-58.  In fact, as will be shown through discovery, HITN also used RJG's 2012 identification of Incremental Audit Revenue in negotiating the final 2016 T2 Transaction.  Thus, RJG remained closely connected to the T2 Transaction, even into 2016.

[10] This answers HITN's complaint from RJG's initial pleading regarding "substantially improved market conditions."  *See* Mot. at 20.  Those market conditions were never the cause of the consummation of the transaction, but instead, merely, the triggering event that was contemplated by RJG and HITN at the time HITN "paused" the transaction.  HITN cannot transform a prerequisite for completion of the deal into an intervening cause when that event was fully contemplated and foreseen by the parties at the time RJG identified Incremental Audit Revenue.

24

Revenue, the "consequence" of which was the provision of additional payments to HITN.  SAC,

Ex. A, ¶ (1)(b)(iii).  Once RJG made this "identification," it had accomplished its job.  From that

point on, so long as a "continuing connection" existed between RJG's work and the final deal,

RJG was entitled to payment under the contract.  *See Simon*, 28 N.Y.S.2d at 142-43.

HITN's argument—that RJG should not be entitled to payment *as a matter of law* unless

RJG's work led immediately to the T2 Transaction without any further negotiations—if carried

to its logical conclusion, would end the use of matchmaker or broker contracts.  Such contracts

often premise payment on an initial identification of an opportunity by a third party, which then

initiates a set of events that later leads to the consummation of a deal between two other parties.

Contrary to HITN's assertions, courts routinely find this initial identification to be a proximate

cause of the deal, even if significant time passed before it was finalized.  *See Simon*, 28 N.Y.S.2d

at 142-43; *Seckendorff v. Halsey, Stuart & Co.*, 234 A.D. 61, 70-71 (N.Y. App. Div. 1931), *rev'd*

*on other grounds*, 259 N.Y. 353, 357 (1932) (one-year lapse in negotiations did not preclude

finding that the transaction "flowed directly from" the finder's introduction); *Schaller v. Litton*

*Indus., Inc.*, 307 F. Supp. 126, 132 (E.D. Wisc. 1969) (lapse of two years and existence of

additional party did *not* create "an intervening source sufficient to cut off the causal connection

between [plaintiff's] matchmaking efforts and the eventual consummation of a merger," where

defendant "was only waiting for the opportune moment at which to reopen merger discussions").

Similarly, HITN misses the point by arguing that "[i]f Plaintiffs were correct, there would

be no limit on the amount of time that could pass between HITN's receipt of the 2012 funds and

its entry into a later transaction."  Mot. at 20-21.  Certainly, if a set of unforeseen circumstances

came about that severed the "continuing connection" required, this might create an intervening

25

cause sufficient to cut off liability.  But the case law teaches that the passage of time, in-and-of-itself, is *not* sufficient to do so.  *Simon*, 28 N.Y.S.2d at 142-43.  And this highly fact intensive inquiry cannot be decided on this Motion.  *NAF Holdings*, 2016 WL 3098842, at *6.

But even more fundamentally, there is no reason to engage in this type of hypothetical analysis here because the SAC's well-pled allegations render it entirely unnecessary.  Notably, the SAC alleges that "[b]etween 2012 and late 2015, essentially nothing happened with respect to furthering negotiations of the T2 Transaction."  SAC ¶ 49; SAC ¶ 56.  Far from being required to ponder a deal taking place "a decade or longer in the future" as HITN asks the Court to do, *see* Mot. at 21, the *actual* deal described by the SAC was—in effect—an immediate continuation of that begun in 2012.  *See id.*; SAC ¶ 52. Thus, because the SAC alleges that the final T2 Transaction was a direct continuation of the negotiations begun and paused in 2012, there are no intervening changes in circumstances or negotiations that might have acted as an intervening cause separating the final T2 Transaction from that contemplated in 2012.  *Schaller*, 307 F. Supp. at 132 (finding proximate cause existed for a matchmaking fee where the defendant "was only waiting for the opportune moment at which to reopen merger discussions").[11]

Nor do the cases cited by HITN regarding broker and real estate relationships militate otherwise.  *See* Mot. at 15-16.  To the contrary, the court in *Moore v. Sutton Res., Ltd.*, No. 96

---

[11] Tellingly, in its initial Motion to Dismiss, HITN took the position that the 2016 final T2 transaction came about "as the 'consequence' of HITN's own efforts" because "HITN spent *four years* developing, negotiating, and ultimately executing without RJG–MD's involvement …." Doc. No. 20-1 at 13.  Then, in its second Motion to Dismiss, HITN argued that multiple "intervening causes" required dismissal as a matter of law.  *See* Doc. No. 28-1 at 14.  HITN now abandons that argument as well.  *See* Mot. at 20.  HITN's three different positions in their three motions to dismiss show a continually moving target, where HITN continues to throw up every possible argument (no matter how farfetched), in the hopes that something might stick.

26

Civ. 7522 (RWS), 1998 WL 67664 (S.D.N.Y. Feb. 18, 1998), specifically acknowledged that a "'continuing connection' between the finder's service and the ultimate transaction" is sufficient for causation in such circumstances. *See id.* at *4 (citing *Simon*, 28 N.Y.2d at 142). The court did find, at the *summary judgment* phase, that proximate cause did not exist, *but only* because its case contained facts "showing a five year lapse between introduction and deal, significant unforeseen changes in circumstances, and a prior relationship and multiple third-party interventions providing an independent basis for the transaction." *Id.* at *6. These facts are far different from those present here, which, like *Simon* and *Seckendorff*, show a "continuing connection" based on a set of previously contemplated events fully foreseen at the time RJG identified Incremental Audit Revenue. *Cf. Karelitz v. Damson Oil Corp.*, 820 F.2d 529, 531-32 (1st Cir. 1987) (finding the plaintiff was not entitled to a finder's fee where (1) 8 years had elapsed from the time of the introduction to the beginning of the successful negotiations; (2) the relevant circumstances had changed dramatically during the eight year period; and (3) the seller's eventual interest in the successful sale had nothing to do with the original introduction).

Mr. Geist did the job he was asked to do, and caused HITN to earn nearly two hundred million dollars more than it otherwise would. He should be compensated under the contract's plain language. *Schaller*, 307 F. Supp. at 132 ("The questions involved here are whether Schaller was asked to do a job, whether he did it, and if he did, whether he should get paid.").

### 3. The Agreement Specifically Provides for Payment for Amounts Resulting From the Identification of Incremental Audit Revenue

Section 1(b)(iii) plainly provides that when HITN receives additional payments from Clearwire as "a consequence of the identification by Geist of Incremental Audit Revenue," then

27

"Geist shall be entitled to payment hereunder *for the additional payments received by HITN*."

(emphasis added).  Despite this clear language, HITN argues that RJG is entitled to nothing more

than 10% of the Incremental Audit Revenue RJG identified *before* HITN consummated the T2

Transaction.  Because this interpretation contradicts the contract's plain language and would

render a significant portion meaningless, it cannot be countenanced.

As described above in Section 1(A), Section 1(b)(iii)'s first sentence provides that "when

there is a payment to HITN in respect of any Incremental Audit Revenue," RJG "shall be entitled

to payment of ten percent (10%) of the amount of such Incremental Audit Revenue."  The

"provided that" clause then creates a separate payment obligation that is tied to the receipt of

*additional* payments from Clearwire obtained as a consequence of the identification of

Incremental Audit Revenue, *not* to the receipt of Incremental Audit Revenue itself:

> [P]rovided that, if HITN receives **additional payments from Clearwire** that have not
> been proposed or agreed prior to the date hereof … but such payments are a
> **consequence** of the identification by Geist of Incremental Audit Revenue, then Geist
> shall be entitled to payment **hereunder for the additional payments received by HITN**.

As such, Section 1(b)(iii) provides two separate payment prongs based on two different

factual situations.  First, when HITN actually receives Incremental Audit Revenue (based on

current agreements with Clearwire), RJG will be entitled to 10% of "the amount of such

Incremental Audit Revenue."  *See* SAC, Ex. A ¶ 1(b)(iii).  Second, when HITN receives

"additional payments" that resulted from new agreements with Clearwire "as a consequence of

the identification by Geist of Incremental Audit Revenue" (which, because they were not in

existence at the time cannot, themselves, be Incremental Audit Revenue), RJG will be "entitled

to payment hereunder for the additional payments received by HITN."  *See id.*  Thus, the phrase

28

"payment hereunder" simply refers to payment under Section 1(b)(iii) as a whole, which designates an entitlement to 10% of any payments received under that section.[12]

Despite these two separate entitlements, each triggered based on a different factual scenario (*i.e.*, the receipt of (a) Incremental Audit Revenue; *or* (b) additional payments as a consequence of Incremental Audit Revenue), HITN argues that, in either situation, the phrase "payment hereunder" entitles RJG to only 10% of the actual Incremental Audit Revenue RJG had previously identified.  *See* Mot. at 23.  ***First***, this argument is fundamentally flawed because it contradicts the plain language of the "provided that" clause, which provides for "payment hereunder for the *additional payments received by HITN*."  (emphasis added).  If payment were restricted as HITN contends, then RJG would only be entitled to payment for Incremental Audit Revenue actually received, not for those additional payments received as a *consequence* of the identification of Incremental Audit Revenue.   Because HITN's construction would entirely omit this separate entitlement to additional payments, it fails to give meaning to "every clause and word of [the] contract," and cannot be countenanced.  *See Aeronautical Indus.*, 230 F.3d at 576.

Similarly, because the entitlement to payment for Incremental Audit Revenue actually received is clearly stated in Section 1(b)(iii)'s first sentence, interpreting Section 1(b)(iii)'s second sentence to confer the *exact same entitlement* would render it entirely superfluous.  Such a construction should *not* be given effect.  *See Aeronautical Indus.*, 230 F.3d at 576 (refusing to accept a contractual interpretation that "render[ed] the 'every effort' sentence superfluous by

---

[12] As described above in Section 1(A), this interpretation makes sense because the "provided that" clause acts as an exception to the limitations otherwise set out in the "avoidance of doubt" section.  It thus created a subset of Audit Services, which were to be compensated under Section 1(b)(iii)'s 10% framework, as opposed to that in the separate "Consulting Services" section.

29

reducing the paragraph to an understanding informed by only the 'therefore' sentence");

*McQuade*, 67 A.D.3d at 869 (refusing to "render the alternate payment provision meaningless").

***Second***, this interpretation of "payment hereunder" comports with how that phrase is

used in other payment provisions of the Services Agreement.  Specifically, Section 1(c)(ii)

provides for a payment regime whereby RJG would be entitled to 15% of cash received by HITN

when certain conditions are met.  *See* SAC, Ex. A, ¶ (1)(c)(ii).  Later on in the same section, the

contract provides that "[a]ll payments due hereunder shall be in respect of the initial term of any

IUA and shall not apply to any renewals thereof."  Thus, the phrase "payments due hereunder" is

used to refer to any payments due under the section as a whole, not to artificially limit those

payments to those contained in only the first sentence of the section.  Similarly, "payment

hereunder" in Section 1(b)(iii) simply refers to payment under the 10% regime established by

that section, *not* to only payment of 10% of Incremental Audit Revenue.

***Third***, providing RJG with 10% of any additional payments received as a result of RJG's

work makes good business sense.  Notably, this is "fully in line with Mr. Geist's standard

arrangements with other holders of EBS spectrum licenses for whom he provided these

services."  SAC ¶ 22.  As such, it is not a "massive windfall," as HITN contends.  *See* Mot. at 11.

Moreover, such a provision would incentivize Mr. Geist to work as diligently as possible to assist

HITN in maximizing payments from future contracts (*i.e.*, the T2 Transaction), just as he was

incentivized by the first sentence to do so in auditing HITN's existing contracts with Clearwire.

Thus, RJG's interpretation actually harmonizes the first sentence with the "provided that" clause

in a way that HITN's does not.  It shows a consistent intent throughout Section 1(b)(iii) to

provide RJG with 10% of any additional payments obtained by HITN through his work.

30

*Finally*, as discussed above in Section 1(A), RJG's interpretation of "payment hereunder" is the only construction that is consonant with the *objective, expressed* intent of the parties in drafting the Services Agreement.  SAC ¶¶ 24, 30.  Given the evidence of the parties' *objective* intent pled by RJG, the Court should not find the contract to be so unambiguous as to completely contradict the parties' purpose in drafting it.  *See Williams*, 37 N.Y.2d at 440 (courts should "choose that construction which will carry out the plain purpose and object of the indenture").

In short, HITN's entire Motion is based on its repeated refusal to acknowledge Section 1(b)(iii)'s second sentence, and HITN works tirelessly to render it without effect.  But HITN cannot escape the plain language of the contract it signed, and its Motion should be denied.

### C.     At a Bare Minimum, the Services Agreement Is Ambiguous, Which Precludes Resolution of Questions of Contract Interpretation on This Motion

Where "[b]oth parties offer interpretations with a sound basis in the language of the [contract]," or where the contract "is susceptible to more than one reasonable interpretation," the agreement is ambiguous.  *Sayers*, 7 F.3d at 1095; *Agor v. Bd. of Educ.*, 981 N.Y.S.2d 485, 487 (N.Y. App. Div. 2014) ("A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion.").  Unless contractual language possesses "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion," it *cannot* be construed on a motion to dismiss.  *See Telerep, LLC v. U.S. Intern. Media, LLC*, 903 N.Y.S.2d 14, 15 (N.Y. App. Div. 2010).

Here, as discussed above, RJG respectfully submits that Section 1(b)(iii)'s second sentence plainly entitles RJG to 10% of any additional payments HITN receives from the T2

31

Transaction beyond those proposed by Clearwire in 2012.  Nevertheless, at a bare minimum, the

parties have both put forth "reasonable interpretations" on a number of disputed issues, including

(a) whether Section 1(b)(iii) applies to post-April 2012 contracts; (b) the meaning of the phrase

"forms other than those intended under original IUAs and other current agreements;" (c) the

effect of the phrase "a consequence of" on any causation analysis; (d) the interpretation of the

phrase "payment hereunder" and how it entitles RJG to compensation; and (e) more broadly, the

meaning of the second sentence of Section 1(b)(iii) as compared to the first.  If the Court finds

that *any* of these provisions are less than "crystal clear," it should deny this Motion to Dismiss.

*See, e.g.*, *Martin Marietta*, 978 F.3d at 142 ("[W]hile Martin Marrietta's interpretation plausibly

harmonizes the two articles, the contract is far from crystal clear and never refers to 'pre-launch'

or 'post-launch' damages or otherwise mandates Martin Marietta's interpretation.").

Moreover, the Court faces here a factual situation where one party (HITN) provided a

draft services agreement to another (RJG), which did not include a key provision to which the

parties expressly agreed.  SAC ¶¶ 21, 23.  This required Mr. Geist to insert that language into the

draft agreement so as to ensure that HITN would be held to its bargain.  SAC ¶ 24.  The parties

now dispute whether this contractual construction applies *to the very transaction to which it was

expressly intended to apply*.  SAC ¶ 30.  Consequently, at a bare minimum, the Court should not

allow a construction that frustrates the very purpose of the provision without first considering the

extrinsic evidence available.  *See Teig v. Suffolk Oral Surgery Assocs.*, 2 A.D.3d 836, 838 (N.Y.

App. Div. 2003) (rejecting literal interpretation of contract phrase because any other holding

would "frustrate one purpose of the provision . . . while providing a windfall to the plaintiff not

contemplated anywhere in the agreement").  The Court should deny HITN's Motion.

32

**II.     RJG States a Claim Under the Implied Covenant of Good Faith and Fair Dealing**

*First*, "[a] party may be in breach of the implied duty of good faith and fair dealing …

when it exercises a contractual right as part of a scheme … to deprive the other party of the fruit

of its bargain." *Gray & Assocs., LLC v. Speltz & Weis LLC*, 22 Misc. 3d 1124(A) (N.Y. Sup. Ct.

2009); *Moran v. Erk*, ---NY.2d ---, 2008 WL 4975380 (N.Y. App. Div. 2008).  Thus, where a

party's allegations "go beyond claiming only that [the defendant] should be precluded from

exercising a contractual right … [and] support a claim that [the defendant] exercised a right

malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the

benefit [of their bargain], the plaintiff states a claim … separate and apart from a contract claim."

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (N.Y. App. Div. 2003).

Here, the SAC specifically alleges that HITN breached the implied covenant of good

faith and fair dealing by terminating RJG "just weeks after Mr. Geist again reminded HITN of

his entitlement to 10% of the additional payments in the terms of the T2 Transaction," as part of

a "failed effort to cut off its continuing liability under section (1)(b)(iii) of the Services

Agreement."  SAC ¶ 90.  Thus, RJG's allegations under this Count do not relate directly to any

direct breaches of HITN's contractual obligations.  Instead, they relate to HITN's actions in

seeking to deprive RJG of the benefit of its bargain while concomitantly seeking to obtain the

full benefits for which it contracted.  *See id.* This malevolent scheme to deprive RJG of the

benefit of its bargain constitutes a different set of facts than those on which RJG's contract

claims are based and precludes dismissal.  *See Richbell*, 309 A.D.2d at 302; s*ee also Friedman v.

Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 195 (E.D.N.Y. 2014) (denying motion to

dismiss where complaint alleged "that Maspeth misrepresented its records and policy, depriving

33

plaintiff of the fruits of their agreement and causing emotional harm").

*Second*, "[e]ven where one has an apparently unlimited right under a contract, that right may not be exercised solely for personal gain in such a way as to deprive the other party of the fruits of the contract." *Richbell*, 309 A.D.2d at 302. "This limitation on an apparently unfettered contract right may be grounded . . . on the purely contractual rule that even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement." *Id.* Here, again, the issue is *not* whether "issues relating to HITN's right to terminate the contract are expressly addressed in the contract itself," as HITN contends. Instead, it is whether HITN engaged in "bad-faith targeted malevolence in the guise of business dealings." *Richbell*, 309 A.D.2d at 302. This states a viable claim for relief.

## III.    RJG's Declaratory Judgment Claim Is Not Duplicative of Its Contract Claim

Declaratory judgment is appropriate to clarify the parties' future obligations. *Metra Indus., Inc. v. Rivanna Water & Sewer Auth.*, No. 3:12CV00049, 2014 WL 652253, at *3 (W.D. Va. Feb. 19, 2014). While HITN argues that RJG's claim is duplicative of its contract claim, this is *not* correct. Rather, under the T2 Transaction's payment structure, Clearwire has not yet made all of the payments to HITN that are called for. Thus, the contract claim is meant to capture those payments currently due and owing to RJG, while the Declaratory Judgment claim will settle the parties' rights with respect to future payments under the T2 Transaction. Because each addresses different payments, they should both proceed. *See* FAC ¶ 95.

## IV.    RJG's Unjust Enrichment Claims Do Not Improperly Duplicate Contract Claims

While a plaintiff may not ordinarily *recover* under both a breach of contract and unjust enrichment claim, "the federal rules freely permit pleading alternative theories of recovery, even

34

if inconsistent." *SunDance Rehab. Corp. v. Hermitage Healthcare of Manokin Manor, LLC*, No. CIV.A. WMN-12-153, 2012 WL 2190749, at *3 (D. Md. June 13, 2012).  "Where the existence of a contract covering the subject matter is potentially in dispute, pleading alternative contract and quasi contract claims is a common and acceptable practice."  *Id.*  Indeed, "it is inappropriate to dismiss a quasi-contractual claim even in the presence of an express contract when the parties disagree as to their respective contractual liability."  *U.S. ex rel. All State Const., Inc. v. SEI Grp., Inc.*, No. CIV.A. DKC 14-0131, 2014 WL 3571980, at *3 (D. Md. July 18, 2014).  Moreover, "a claim for unjust enrichment is not duplicative of a breach of contract claim where the plaintiff alleges that the contracts were induced by fraud."  *Rodriguez v. It's Just Lunch, Int'l*, No. 07 CIV. 9227 SHS, 2013 WL 1749590, at *5 (S.D.N.Y. Apr. 23, 2013).

Here, HITN argues that Section 1(b)(iii) entirely excludes payment for any contracts obtained as a consequence of RJG's work after the date of the Services Agreement, a right explicitly agreed to by the parties prior to drafting the Services Agreement.  *See* SAC ¶¶ 21-25. Moreover, the parties disagree as to virtually every aspect of Section 1(b)(iii).  Given the parties' "disagree[ments] as to their respective contractual liability," the preliminary stage of the proceeding, and the potential fraud involved in procuring the contract, "it is inappropriate to dismiss [RJG's] quasi-contractual claim."  *See All State*, 2014 WL 3571980, at *3.

## <u>CONCLUSION</u>

For all of the reasons stated herein, RJG respectfully requests that the Court deny HITN's Motion in its entirety. To the extent the Court grants any part of the Motion, considering that RJG has not yet had the benefit of the Court's guidance and that leave to amend should be liberally granted, RJG respectfully requests an opportunity to amend to address the Court's concern.

35

Dated:  June 23, 2017                          Respectfully submitted,

                                               **RUDOLPH J. GEIST**
                                               **RJGLAW LLC**
                                               **RJGLAW LLC**

                               By:     /s/ Benjamin G. Chew
                                       Benjamin G. Chew (D. Md. Bar No. 14985)
                                       Manatt, Phelps & Phillips, LLP
                                       1050 Connecticut Avenue NW, Suite 600
                                       Washington, DC 20036
                                       Telephone:     (202) 585-6511
                                       Facsimile:     (202) 585-6600
                                       Email:         bchew@manatt.com

                                       *Counsel for Plaintiffs Rudolph J. Geist, RJGLaw*
                                       *LLC, and RJGLaw LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on June 23, 2017, I filed via the Court's CM/ECF system the foregoing

Opposition to Motion to Dismiss, and I understand that the system caused service of that

Opposition on counsel for all parties to this action.

/s/ Benjamin G. Chew
Benjamin G. Chew (D. Md. Bar No. 14985)
Manatt, Phelps & Phillips, LLP
1050 Connecticut Avenue NW, Suite 600
Washington, DC 20036
Telephone:     (202) 585-6511
Facsimile:      (202) 585-6600
Email:            bchew@manatt.com

*Counsel for Plaintiffs Rudolph J. Geist, RJGLaw
LLC, and RJGLaw LLC*

204080792.3