**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Greenbelt Division)**

RUDOLPH J. GEIST, et al.,

      Plaintiffs,

      v.                                                    Case No. 8:16-cv-3630

HISPANIC INFORMATION AND
TELECOMMUNICATIONS NETWORK,
INC.,

      Defendant.

**CORRECTED REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT ..................................................................................................................................2

I.  THE CONTRACT CLAIM FOR A SHARE OF THE 2016 TRANSACTION FAILS BECAUSE THE CONTRACT BARS RECOVERY AS TO PAYMENTS ARISING FROM POST-2012 CONTRACTS....................................................................2

   A.  The Contract Bars Recovery Of Payments Arising From Post-2012 Contracts........................................................................................................................2

   B.  The Contract's Structure And Purpose Confirm That Recovery Is Barred As To Payments Arising From Post-2012 Contracts.......................................................5

   C.  The Contract Is Not Ambiguous...............................................................................6

II.  THE CONTRACT CLAIM FOR A SHARE OF THE 2016 TRANSACTION FAILS EVEN IF THE CONTRACT PERMITS RECOVERY AS TO PAYMENTS ARISING FROM POST-2012 CONTRACTS....................................................................8

   A.  The 2016 Transaction Did Not Generate Payments In "Forms Other Than Those Intended Under [Then Existing] Agreements" ...............................................8

   B.  The 2016 Transaction Was Not "A Consequence Of The Identification By [RJG-MD] Of Incremental Audit Revenue" ..........................................................10

      1.  The Contract Requires Proximate Causation............................................10

      2.  The SAC Does Not Allege That The 2016 Transaction Was "A Consequence Of . . . Incremental Audit Revenue"...................................12

      3.  Plaintiffs Do Not Allege a "Continuing Connection" ..............................14

   C.  The Services Agreement Only Permits Payment As To Incremental Audit Revenue—Not Amounts Resulting From Such Revenue ......................................16

III.  THE IMPLIED COVENANT, DECLARATORY JUDGMENT, AND UNJUST ENRICHMENT CLAIMS DUPLICATE THE CONTRACT CLAIM ...........................18

   A.  The Implied Covenant Claim Should Be Dismissed As Duplicative...................18

   B.  The Declaratory Judgment Claim Should Be Dismissed As Duplicative ............19

   C.  The Unjust Enrichment Claim Should Be Dismissed As Duplicative .................19

CONCLUSION ............................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Armco Inc. v. Glenfed Financial Corp.*,
  746 F. Supp. 1249 (D.N.J. 1990) ...................................................................3, 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................................9

*Bisceglia v. Int'l Bus. Machs.*,
  287 A.D.2d 674 (N.Y. App. Div. 2001) ...........................................................14

*In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*,
  583 F. Supp. 1388 (E.D. Pa. 1984) ..................................................................16

*Citibank, N.A. v. K-H Corp.*,
  968 F.2d 1489 (2d Cir. 1992) ...........................................................................13

*Cornhusker Farms, Inc. v. Hunts Point Coop. Mkt., Inc.*,
  2 A.D.3d 201 (N.Y. App. Div. 2003) .................................................................7

*Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*,
  358 Md. 83 (2000) .............................................................................................20

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995) ........................................................................................19

*Delibero v. Duloc*,
  No. 156196/2013, 2015 WL 5144358 (N.Y. Sup. Ct. Aug. 31, 2015) ...........12, 13

*Ferguson v. Callanan Indus., Inc.*,
  223 A.D.2d 862 (N.Y. App. Div. 1996) ...........................................................14

*Fernandez v. City of N.Y.*,
  No. 10-5933, 2012 WL 12281783 (E.D.N.Y. Mar. 22, 2012) .............................7

*Fryling v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  593 F.2d 736 (6th Cir. 1979) ............................................................................16

*Gardner v. Brown*,
  5 F.3d 1436 (Fed. Cir. 1993) ............................................................................12

*Greenwich Capital Fin. Prods, Inc. v. Negrin*,
  74 A.D.3d 413 (N.Y. App. Div. 2010) ..............................................................16

*Hotchkiss v. Nat'l City Bank of N.Y.*,
   200 F. 287 (S.D.N.Y. 1911) .................................................................8

*JA Apparel Corp. v. Abboud*,
   568 F.3d 390 (2d Cir. 2009) ...............................................................17

*Jackson v. YAM Holding Corp.*,
   97 A.D.3d 637 (N.Y. App. Div. 2012) ................................................7

*Karelitz v. Damson Oil Corp.*,
   820 F.2d 529 (1st Cir. 1987)...............................................................15

*Kutten v. Sun Life Assurance Co.*,
   759 F.3d 942 (8th Cir. 2014) ..............................................................17

*Libby, McNeill & Libby v. U.S.*,
   115 Ct. Cl. 290 (1950).................................................................11, 12

*Libby, McNeill & Libby v. U.S.*,
   340 U.S. 71 (1950) .............................................................................11

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990) .................................................................7

*MDS (Canada), Inc. v. Rad Source Techs., Inc.*,
   822 F. Supp. 2d 1263 (S.D. Fla. 2011)..............................................3, 4

*Murakami v. U.S.*,
   398 F.3d 1342 (Fed. Cir. 2005)...........................................................12

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
   No. 10-5762, 2016 WL 3098842 (S.D.N.Y. June 1, 2016)....................13

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Greenwich Ins. Co.*,
   103 A.D.3d 473 (N.Y. App. Div. 2013) ................................................7

*Reiss v. Fin. Performance Corp.*,
   97 N.Y.2d 195 (2001)............................................................................7

*Saleh Holdings Grp., Inc. v. Chernov*,
   No. 650177-2010, 2011 WL 452999 (N.Y. Sup. Ct. Jan. 31, 2011) ......13

*Seckendorff v. Halsey, Stuart, & Co.*,
   234 A.D. 61 (N.Y. App. Div. 1931), *rev'd on other grounds*, 259 N.Y. 353 (1932)............15

*Simon v. Electrospace Corp.*,
   28 N.Y.2d 136 (1971)..........................................................................15

*SPRE Realty, Ltd. v. Dienst,*
   119 A.D.3d 93 (N.Y. App. Div. 2014) ...................................................................13

*Standard Oil Co. of N.J. v. U.S.,*
   340 U.S. 54 (1950) ...............................................................................................11

*SurModics, Inc. v. S. Research Inst.,*
   940 F. Supp. 2d 938 (D. Minn. 2013) ....................................................................5

*Triton Partners LLC v. Prudential Sec. Inc.,*
   301 A.D.2d 411 (N.Y. App. Div. 2003) ...............................................................19

*U.S. v. Standard Oil Co. of N.J.,*
   178 F.2d 488 (2d Cir. 1949) .................................................................................11

*U.S. ex rel All State Construction, Inc. v. SEI Grp., Inc.,*
   No. 14-0131, 2014 WL 3571980, at *1, 3 (D. Md. July 18, 2014) .......................20

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.,*
   1 N.Y.3d 470 (2004)................................................................................................7

*Vollmar v. O.C. Seacrets, Inc.,*
   831 F. Supp. 2d 862 (D. Md. 2011)......................................................................13

*W.W.W. Assocs., Inc. v. Giancontieri,*
   77 N.Y.2d 157 (1990)......................................................................................6, 7, 8

*Wall St. Transcript Corp. v. Ziff Commc'ns Co.,*
   225 A.D.2d 322 (N.Y. App. Div. 1996) ...............................................................13

## PRELIMINARY STATEMENT

The Services Agreement clearly states that Plaintiffs were hired to do two specific jobs as relevant here:  (1) to consult for HITN, in return for an hourly fee, and (2) to audit HITN's existing agreements to identify any outstanding payments, in return for a share of recoveries.  It is thus striking that Plaintiffs' opposition brief opens with the sweeping statement, at odds with the contract's text, that "Plaintiffs were hired to do a specific job—*to maximize the value to be obtained from a proposed contract* between [HITN] and [Clearwire]" (emphasis added).  Plaintiffs offer no support for this assertion, and nothing in the Agreement or the SAC supports it.  Plaintiffs' misstatement regarding the job they were hired to do permeates their opposition brief and, once recognized, resolves many of the fundamental issues in dispute on this Motion.

***First***, consistent with the Agreement's plain language indication that Plaintiffs were hired to audit HITN's *existing transactions* in an effort to identify unpaid receivables due to HITN—not *future* transactions—the Agreement states that Plaintiffs are due 10% of the recoveries arising from existing transactions under certain circumstances, and nothing more.  As a result, Plaintiffs are reduced to a series of tortured arguments in an effort to find a payment obligation where none exists—all premised on the mistaken legal argument that a contractual "avoidance of doubt" clause should be construed to create an entirely new and independent obligation.  That effort, which contradicts the contract's text, structure, and purpose, and the applicable case law, is an independent basis for dismissal.

***Second***, even assuming *arguendo* that the contract permits recovery of payments arising out of future transactions, Plaintiffs' claim fails for the three independent reasons that (a) the SAC does not allege payment in a different "form" than certain other agreements, (b) the SAC does not allege payment as a "consequence" of Incremental Audit Revenue, and (c) Plaintiffs' remedy would in any event be limited to 10% of the money they recovered through their audit, not 10% of

the entire future transaction.  The precision with which the contract defines Plaintiffs' "job" and the compensation for that job, further confirms that Plaintiffs were not hired as general business advisors entitled to a generalized share of HITN's overall revenues.

**Finally**, the remaining claims—for breach of the implied covenant of good faith and fair dealing, declaratory judgment, and unjust enrichment—should be dismissed as similarly defective.

The Court should reject Plaintiffs' effort to interpose a massive unstated payment obligation into a clear six-page agreement for services between a nonprofit and its FCC counsel, and dismiss Counts III, IV, V, and VI without leave to file a third amended complaint.

## ARGUMENT

### I.   THE CONTRACT CLAIM FOR A SHARE OF THE 2016 TRANSACTION FAILS BECAUSE THE CONTRACT BARS RECOVERY AS TO PAYMENTS ARISING FROM POST-2012 CONTRACTS

HITN's opening brief demonstrated that Count III must be dismissed because Section 1(b)(iii) of the Services Agreement only permits recovery as to payments due HITN arising from contracts extant as of April 2012.  Payments under the 2016 Transaction do not meet that standard.

#### A.   The Contract Bars Recovery Of Payments Arising From Post-2012 Contracts

Plaintiffs concede that Section 1(b)(iii)'s first sentence precludes recovery as to payments arising from post-April 24, 2012 contracts.  As such, a fundamental question on this motion is whether Plaintiffs can base a claim on Section 1(b)(iii)'s *second* sentence, which starts with the phrase "[f]or the avoidance of doubt."  The answer is "no," because a clause "for the avoidance of doubt" only clarifies what came before—it does not create a new and separate payment obligation.

Plaintiffs' entire theory of the contract requires the "avoidance of doubt" clause to be read as a separate payment obligation.  The SAC (¶ 23) alleges that Section 1(b)(iii)'s first sentence "*d[oes] not include* the [supposedly agreed] terms by which Mr. Geist would receive 10% of any additional value HITN ultimately secured in finalizing the [2016 Transaction]" (emphasis added).

Likewise, Plaintiffs' opposition brief (at 3–4) concedes that Section 1(b)(iii)'s first sentence only "provides Mr. Geist with payment [arising from] *current* agreements," such that *only* the avoidance of doubt clause creates RJG-MD's purported "right to 10% of . . . payments generated by the *future* T2 Transaction . . . ." *See also* Op. 28–29 (avoidance of doubt clause "*creates a separate payment obligation*" and a "separate entitlement"). [1]

But as HITN has demonstrated (Br. at 10), an "avoidance of doubt" clause cannot create a new payment obligation as a matter of case law, plain English, and common sense—it merely restates what came before. Plaintiffs offer no serious rebuttal to Defendants' authorities, instead citing two cases, *MDS (Canada), Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1301 (S.D. Fla. 2011) and *Armco Inc. v. Glenfed Financial Corp.*, 746 F. Supp. 1249, 1261 (D.N.J. 1990), which actually support HITN's position.

In *MDS*, the Court explicitly rejected the notion that an "avoidance of doubt" clause can create an independent obligation. The case concerned a license agreement with three relevant provisions: (1) a sentence granting plaintiff an exclusive license to use specific "Technology" that was protected by three "Patents" and had been incorporated into a "System"; (2) a sentence saying that, as an exception to the exclusive license, defendant retained the right to use the Technology outside the System; and (3) a final sentence stating, "for the avoidance of doubt," that the defendant's retained right did not extend to devices that embodied the Patents. When the defendant used the technology outside the system but as to a device that embodied the Patents, plaintiff sued. The Court rejected plaintiff's claim, holding that the "avoidance of doubt" sentence was merely a clarification of what came before and did not create an independent exclusivity right:

---

[1]   The "avoidance of doubt clause," as used herein, refers to the entire second sentence of Section 1(b)(iii), including the phrase beginning "provided that."

> [T]he [avoidance of doubt sentence] was meant *only to clarify* [defendant's] retained rights under the second sentence, which allowed [defendant] to use the . . . Technology (including the Patents) for all purposes other than the [System]. Hence, **the [avoidance of doubt clause] could not have and was not intended to create any additional obligation upon [Defendant] separate and distinct from that set forth in the first two sentences of that provision.**

*MDS,* 822 F. Supp. 2d at 1305 (emphasis added).  That conclusion—that an "avoidance of doubt" clause cannot create an "additional obligation" that is "separate and distinct" from the obligation already set forth in the text it is meant to clarify, is the opposite of Plaintiffs' position here. [2]

Plaintiffs' other case, *Armco*, likewise supports HITN.  *No party* in *Armco* suggested that an "avoidance of doubt" clause can create a new substantive right.  To the contrary, plaintiff argued that the clause provided a means by which to "avoid doubt" about other contractual language; defendant agreed that the clause "create[d] no substantive rights"; and the Court adopted a reading consistent with plaintiffs' view.  *Armco Inc.*, 746 F. Supp. at 1262–63.

Plaintiffs' other efforts to escape the plain meaning of Section 1(b)(iii) likewise fail.  Plaintiffs argue that HITN's reading would render the "avoidance of doubt" sentence meaningless.  That is nonsense.  As relevant here, Section 1(b)(iii) functions in three steps, *all* of which govern the circumstances in which RJG-MD can claim payment arising from pre-2012 contracts:

- The first sentence states that RJG-MD can assert a claim as to payments arising from pre-2012 contracts ("Pre-2012 Claims");

- The first half of the "avoidance of doubt" sentence clarifies a situation in which RJG-MD can *not* assert a Pre-2012 Claim, *i.e.*, as to certain increased payments that were then being negotiated (the "Limitation"); and

- The second half of the "avoidance of doubt" sentence (starting with the phrase "provided that") specifies a circumstance in which RJG-MD *can* assert a Pre-2012

---

[2]  The *MDS* Court examined extrinsic evidence because, on the facts of the case, it determined that an ambiguity existed.  There is no such ambiguity here.

Claim, notwithstanding the Limitations—*i.e.*, as to incremental audit revenue that had been added to and paid as part of a larger transaction.[3]

Because the first and second sentences of Section 1(b)(iii) are complementary and perfectly consistent with one another, Plaintiffs' reliance on the canon of construction favoring specific over general language fails.  *SurModics, Inc. v. S. Research Inst.*, 940 F. Supp. 2d 938, 943–44 (D. Minn. 2013) (canon "only applies when the specific and general provisions address the same issue and, in addressing the same issue, the specific and general provisions conflict").

**B.  The Contract's Structure And Purpose Confirm That Recovery Is Barred As To Payments Arising From Post-2012 Contracts**

HITN's opening brief (at 11) demonstrated that the structure of the Agreement confirms Plaintiffs are not entitled to a 10% share of Incremental Audit Revenue arising from post-April 2012 transactions, because Plaintiffs' work advising on those transactions would instead have been compensable at the rate of $400 per hour as consulting services.  Plaintiffs counter (at 13) that, on their reading, the "avoidance of doubt" clause merely clarifies that if certain work could be construed as both audit and consulting work, it would nonetheless be compensated as audit work. But Plaintiffs' interpretation of the contract is much more radical than that.  Far from merely clarifying which of two buckets a given task would fall into for compensation purposes (*i.e.*, consulting work at $400 per hour, or audit work at 10% of the value of Incremental Audit Revenue), Plaintiffs' interpretation of the "avoidance of doubt" clause creates an entirely new payment obligation (*i.e.*, 10% of the value of *an entire future transaction*).  That is not a matter of choosing between two buckets.  Rather, Plaintiffs' construction implausibly seeks to create an

---

[3]  That structure, in which sums due under an existing transaction were folded into the deal documents associated with a new transaction, was not novel to the parties at the time.

entirely *new* bucket, involving vastly more compensation than was available under the existing ones (Br. at 11).  That reading does violence to the contractual structure and should be rejected.

Likewise unavailing is Plaintiffs' contention (at 11–12) that their work advising on future transactions could not have been compensable as consulting services, because such services were purportedly restricted to advice on existing contracts.  Although the Consulting Service's "Scope" section states that RJG-MD was to review existing contracts, its "Payment" section states that RJG-MD would be paid for that work when "new or modified IUAs" were entered into—*i.e.*, that RJG-MD would review existing contracts to facilitate potential new or amended contracts as appropriate.  That is by contrast to the Audit Services section, in which the "Scope" and "Payment" sections are both explicitly limited to payments arising from pre-2012 contracts.[4]

## C.    The Contract Is Not Ambiguous

Finally, the Court should reject Plaintiffs' argument that the second half of the "avoidance of doubt" clause—which Geist himself allegedly drafted (SAC ¶ 24)—is "ambiguous" and mandates consideration of extrinsic evidence concerning Mr. Geist's contemporaneous intent.

Plaintiffs' argument ignores basic New York law governing contract interpretation.  As New York's highest court has held, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms [and] *evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible* to add to or vary the writing."  *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162–63 (1990) (emphasis added).  This rule "imparts 'stability to commercial transactions by safeguarding against fraudulent claims, . . . infirmity of memory . . . [and] the fear

---

[4] Plaintiffs also mistakenly argue (Opp. 12) that their advice could not have been compensated as consulting services because "HITN does not claim [in this motion to dismiss] that it ever 'specifically requested [the advice] in writing.'"  HITN cannot make factual claims on this motion.

that the jury will improperly evaluate the extrinsic evidence.'" *Id.* at 162.  Moreover, "[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation," *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990), and "extrinsic and parol evidence is not admissible to *create* an ambiguity in a written agreement which is complete and clear and unambiguous on its face," *W.W.W. Assocs.*, 77 N.Y.2d at 162–63 (emphasis added); *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (same).

The foregoing principles apply with particular focus here because as noted in HITN's opening brief, Mr. Geist is a lawyer, the other Plaintiffs are law firms, and the Services Agreement is fully integrated.  *See, e.g.*, *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (rule that contracts should be enforced according to their terms is applied with even greater force in commercial contracts negotiated at arm's-length by sophisticated, counseled businesspeople); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Greenwich Ins. Co.*, 103 A.D.3d 473, 474 (N.Y. App. Div. 2013) (barring extrinsic evidence "especially since the contract contains a merger clause").  Provisions Mr. Geist supposedly intended to write are irrelevant and there is no basis for this Court to delay dismissal to consider extrinsic evidence of his intent.  That is particularly so because the contract says the opposite of what Mr. Geist contends.  *See Fernandez v. City of N.Y.*, No. 10-5933, 2012 WL 12281783, at *4 (E.D.N.Y. Mar. 22, 2012) (granting motion to dismiss despite contention that release was ambiguous and required consideration of extrinsic evidence); *Jackson v. YAM Holding Corp.*, 97 A.D.3d 637, 638 (N.Y. App. Div. 2012) (affirming dismissal because court "properly declined to consider extrinsic evidence" of intent); *Cornhusker Farms, Inc. v. Hunts Point Coop. Mkt., Inc.*, 2 A.D.3d 201, 205 (N.Y. App. Div. 2003) (similar).

Plaintiffs' cases (at 31) merely hold dismissal inappropriate where ambiguity exists as a matter of law.  There is no ambiguity here.  At most, an accomplished transactional lawyer is

impermissibly seeking to introduce extrinsic evidence of what he claims to have "intended but [left] unstated or misstated . . . ." *W.W.W. Assocs.*, 77 N.Y.2d at 162–63; *see Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) (Learned Hand, J.) (even "[i]f . . . it were proved by twenty bishops that either party, when he used the [contract's] words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort").

## II.   THE CONTRACT CLAIM FOR A SHARE OF THE 2016 TRANSACTION FAILS EVEN IF THE CONTRACT PERMITS RECOVERY AS TO PAYMENTS ARISING FROM POST-2012 CONTRACTS

### A.   The 2016 Transaction Did Not Generate Payments In "Forms Other Than Those Intended Under [Then Existing] Agreements"

Even if the Court were to hold that the "avoidance of doubt" sentence creates an independent payment obligation under which recovery is permissible as to payments arising out of post-2012 contracts, Plaintiffs' claim still fails as the SAC does not allege that the 2016 Transaction generated payments in "forms other than those intended under [1] original IUAs and [2] other current agreements between HITN and Clearwire," as the Agreement requires.  Br. at 10.

*First*, the SAC does not adequately allege payment in forms different from "other current agreements between HITN and Clearwire."  The only allegation Plaintiffs point to in opposition is a conclusory half-sentence that parrots the contractual language by stating that "[t]he additional payments HITN received for the final T2 Transaction are in forms other than those intended under . . . other current agreements between HITN and Clearwire" (¶ 62).  Plaintiffs argue (at 17–18) that this satisfies Rule 8 because "all that is required at this stage of the proceeding" is an assertion of fact plus a "*factual basis* for that allegation" (emphasis added).  But the SAC does *not* provide a "factual basis for th[e] allegation."  It merely offers "labels and conclusions," and "naked

assertions devoid of further factual enhancement" that are insufficient to state a claim and this Court need not accept as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although HITN's opening brief marshalled case law, context, and procedural history to show that Plaintiffs' failure to state a claim was not accidental, Plaintiffs studiously ignore all of this in opposition. As to HITN's citation to two Fourth Circuit decisions and two decisions of this Court dismissing claims where plaintiff alleged a conclusion without supporting facts, Plaintiffs' opposition ignores the decisions and relies on boilerplate recitations of the legal standard. As to HITN's argument that Plaintiffs added to the FAC (and now the SAC) a laundry list of *nine* purported forms of consideration as to certain HITN contracts in a *specific effort* to address the arguments in HITN's original motion to dismiss, yet failed to allege *any* purported forms of consideration as to "other current agreements," Plaintiffs have no response. As to HITN's argument that Plaintiffs have failed to state a claim even though they allegedly have knowledge of all the relevant contracts, Plaintiffs merely trumpet that damning fact. *See* Opp. at 18 n.5 ("RJG possesses information regarding all of the original IUAs and other then-current agreements"). And as to HITN's observation that Plaintiffs have now had three opportunities to allege sufficient facts, Plaintiffs' only response is that when they prepared and filed the SAC to remedy another pleading failure—*i.e.,* the repeated and willful assertion of an entire cause of action that had no basis in fact, and which Plaintiffs now admit would have been sanctionable had it remained on file—they "took great care" (n.4) *not* to attempt to remedy the FAC's other pleading deficiencies at the same time.

***Second***, as HITN's opening brief showed, the SAC does not allege payment in forms different from the "original IUAs." Br. at 14–17. Plaintiffs' opposition brief concedes that there is a "semantic distinction" between what the contract requires and what the SAC alleges, but

declares without explanation in a footnote that HITN's argument is nonetheless "insufficient."  As it stands, the only "insufficien[cy]" on this issue is in the SAC's allegations.

*Third*, Plaintiffs mistakenly argue (at 19) that the term "forms" requires not a "mechanical comparison between each type of payment under each agreement" but rather the identification of payment terms "different in some way from those contained in previous agreements."  That is no distinction.  A "comparison between each type [of payment]," is the same thing as an evaluation of whether the payments "differ in some way."  In any event, Plaintiffs do not explain how the unsupported half-sentence in SAC paragraph 61 suffices under *either* analysis.

Ultimately, Plaintiffs' argument comes down to the unsupported promise that "RJG could easily add [the necessary] detail in a [third] amended pleading".  Opp. at 18.  This is no basis to avoid dismissal.  Plaintiffs have quite literally tried, and tried, and tried to state a claim, and failed each time.  As a consequence, HITN has been forced to spend significant sums briefing the same issues over, and over, and over again.  Eight months into this litigation, Plaintiffs have shown no sign of being able to state a valid claim.  They should not be given a fourth bite at the apple.

**B.      The 2016 Transaction Was Not "A Consequence Of The Identification By [RJG-MD] Of Incremental Audit Revenue"**

HITN's opening brief demonstrated that Plaintiffs' claim fails, even if the "avoidance of doubt clause" is read as creating an independent remedy, because the SAC does not sufficiently allege causation.  Plaintiffs' opposition brief fails to rebut that conclusion.

**1.      The Contract Requires Proximate Causation**

Plaintiffs argue that the Services Agreement does not require proximate causation, and instead permits recovery based on a showing of "but for" causation.  The crux of this argument is that Section 1(b)(iii)'s use of the phrase "*a* consequence," rather than "*the* consequence," purportedly denotes a "but-for" standard.  That is incorrect.

**First**, Plaintiffs have no meaningful response to the cases cited in HITN's opening brief, which demonstrate that the term "consequence" mandates proximate cause.  In *Libby, McNeill & Libby v. U.S.*, 115 Ct. Cl. 290, 294 (1950), the Court assessed an insurance policy exemption for "all consequences of warlike operations."   The Court held that "[s]ince the parties to these agreements were creating important legal relations . . . we may assume that they were writing of legal consequences resulting from legal causes."  *Id.* at 312.  The Court thus rejected "but for" causation in favor of "legal" (*i.e.*, proximate) cause.  *Id.* at 313 (affirmed in *Libby, McNeill & Libby v. U.S.*, 340 U.S. 71 (1950)).  The same was true in the companion case *Standard Oil Co. of N.J. v. U.S.*, 340 U.S. 54 (1950), in which the Court insisted upon "proximate cause"— *i.e.*, "that cause which is most nearly and essentially connected with the loss as its efficient cause," *id.* at 57—and declined to follow English decisions with a less demanding standard.  *Id.* at 58.  Plaintiffs try to distinguish the *Libby* cases by arguing that they "do not construe the phrase with the modifying article 'a' and therefore are of no help in interpreting the contractual language at issue" (Opp. at 21), but that is wrong.  As the Court in *Libby* stated its task was to determine whether the loss was "*a consequence*" of a warlike operation.  115 Ct. Cl. at 312 ("We thus reach the question whether the loss . . . was a 'consequence of a warlike operation.'").  *See also Libby*, 340 U.S. at 73 (Frankfurter, J., dissenting) ("The only question is whether . . . the [incident] is fairly to be considered *a 'consequence'* of the warlike activity.") (emphasis added); *U.S. v. Standard Oil Co. of N.J.*, 178 F.2d 488, 490 (2d Cir. 1949) (loss is "'a consequence of hostilities'" where warlike activity was "the dominant and effective cause").

**Second**, Plaintiffs suggestion that the indefinite article "a" lessens the causal standard is wrong as a matter of grammar and logic.  The relevant difference between "a consequence" (which appears in the contract) and "the consequence" (which does not) is that the former permits recovery

if Plaintiffs' work generates more than one consequence.  Although, as noted below, the outcome might be different if an entirely different phrase were used, as *Libby* held (115 Ct. Cl. at 312), the phrase that was used—"a consequence"—requires proximate cause.

*Third*, Plaintiffs mistakenly rely on *Murakami v. U.S.*, 398 F.3d 1342 (Fed. Cir. 2005). Contrary to Plaintiffs' mischaracterization, *Murakami* did not analyze the "choice of the article 'a,'" and did not construe the phrase "a consequence."  Rather, in *Murakami*—which considered the scope of a statute providing restitution to victims of the internment of Japanese-Americans during World War II—the Court analyzed language providing redress to individuals harmed "*as a result of*" governmental actions.  *Id*. at 1351–52, *Murakami* does not control the analysis of the different contractual language here.  Plaintiffs also mischaracterize *Murakami* as holding that "'as the result of . . . mandates only a causation requirement.'"  Opp. at 13.  That language in *Murakami*—which was taken from an earlier case, *Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993), interpreting a different statute providing compensation to veterans for injuries occurring "as the result of hospitalization, medical or surgical treatment . . . "—actually undercuts Plaintiffs' position.  For in *Gardner*, the statute used the article "the," not "a."  Contrary to Plaintiffs' contention, it is not the "article," but rather the noun it modifies, that is relevant to the causation standard.  That noun here is "consequence," and it imposes a proximate cause requirement regardless of how courts have interpreted the different phrases "as a result of" or "as the result of."

### 2.      The SAC Does Not Allege That The 2016 Transaction Was "A Consequence Of . . . Incremental Audit Revenue"

Plaintiffs are equally wrong in arguing that the SAC alleges proximate causation.  ***First***, proximate cause can be resolved now and need not be reserved "for the jury," as Plaintiffs suggest. That was the holding of *Delibero v. Duloc*, No. 156196/2013, 2015 WL 5144358 (N.Y. Sup. Ct. Aug. 31, 2015) (Br. at 21), which Plaintiffs do not address in their opposition, in which the court

dismissed a broker's claim on the pleadings, holding that merely providing an "introduction" is not sufficient to create the requisite causal link. *Id.* at *3 (*quoting SPRE Realty, Ltd. v. Dienst*, 119 A.D.3d 93, 98 (N.Y. App. Div. 2014)); *see also, e.g.*, *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1496–97 (2d Cir. 1992) (plaintiff "did not adequately allege . . . proximately cause[]"; even though "complaint, in a conclusory fashion, avers that 'there is a direct causal link . . . ,' [it] does not detail how the alleged fraud directly and proximately [caused loss]."); *Vollmar v. O.C. Seacrets, Inc.*, 831 F. Supp. 2d 862, 868–69 (D. Md. 2011) (allegations revealed "intervening causes that render implausible a proximate cause conclusion"); *Wall St. Transcript Corp. v. Ziff Commc'ns Co.*, 225 A.D.2d 322, 322 (N.Y. App. Div. 1996) (affirming dismissal for failure to plead proximate cause); *Saleh Holdings Grp., Inc. v. Chernov*, No. 650177-2010, 2011 WL 452999, at *3 (N.Y. Sup. Ct. Jan. 31, 2011) (granting motion to dismiss where "allegations demonstrate that [the] alleged [acts] could not have been a proximate cause . . . as a matter of law"). None of Plaintiffs' cases states a contrary rule. *See, e.g.*, *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10-5762, 2016 WL 3098842, at *6 (S.D.N.Y. June 1, 2016) (proximate cause need not always be referred to the factfinder).

**Second**, the SAC does not allege a causal link. Plaintiffs' theory is that by identifying incremental audit revenue, RJG-MD rescued HITN from insolvency and thereby caused HITN to "pause" negotiations on a below-market transaction. But this gets Plaintiffs nowhere, because even if the audit revenue caused the "pause," the SAC does not allege facts supporting the larger causal leap necessary to state a claim—*i.e.*, that the audit revenue caused HITN to *terminate* the pause years later and hence caused the 2016 Transaction. Plaintiffs contend that terminating the pause was the parties' "*exact plan*," and "this [plan] provides the 'continuing connection' necessary for proximate cause." Opp. at 24 (emphasis in original). But the supposed "plan"—

pursuant to which the parties supposedly agreed to await "substantially improved market conditions" that Plaintiffs state in their brief were a "prerequisite for a deal" that the parties "fully contemplated and fors[aw]" (Opp. at 24 n.10)—is not alleged in the SAC.  SAC paragraphs 44–47, which Plaintiffs cite in support (Opp. at 24) merely allege that the audit revenue enabled HITN to reject a below-market deal that HITN would otherwise have accepted.  The SAC does *not* allege that the parties "plan[ned]" to await improved market conditions, that the audit revenue caused improved market conditions, that the audit revenue caused HITN to terminate the "pause," or that the audit revenue caused the 2016 Transaction.  This irremediable flaw in Plaintiffs' causation theory as a matter of law perhaps explains why the SAC, on its face, alleges only "but for" causation (SAC ¶ 59), and why Plaintiffs urge this Court to ignore proximate cause altogether.  *See Bisceglia v. Int'l Bus. Machs.*, 287 A.D.2d 674, 675 (N.Y. App. Div. 2001) ("'but for' analysis . . . has been rejected as a basis for liability" under proximate cause framework); *Ferguson v. Callanan Indus., Inc.*, 223 A.D.2d 862, 862 (N.Y. App. Div. 1996) (similar).

*Third*, Plaintiffs' new theory of causation fails for a related reason:  Although the contract permits recovery only if the 2016 Transaction was "a consequence of . . . *incremental audit revenue*," Plaintiffs now contend that the 2016 Transaction was instead a consequence of the "plan" that RJG-MD supposedly developed and advised HITN to implement.  "Plans" are not compensable under the "audit services" clause of the Agreement.  At most, they might be compensable at $400 per hour as *consulting services* under Section 1(a)(ii).  *See also* Compl. ¶ 38 (2016 Transaction resulted from RJG-MD's "*advice* regarding the poor economics of the deal . . . .").

### 3.    Plaintiffs Do Not Allege a "Continuing Connection"

The SAC's own allegations confirm the absence of a continuing connection.  *See* Br. 17–22.

14

*First*, in an effort to downplay the four-year gap between the 2012 offer and 2016 Transaction, Plaintiffs argue (at 26) that the passage of time alone is not dispositive.  But the passage of time is a well-established intervening factor in assessing causation under New York law.  *See* Br. at 22 (citing, *inter alia*, *Karelitz v. Damson Oil Corp.*, 820 F.2d 529, 532 (1st Cir. 1987)).   Rather than assess the passage of time in isolation, the relevant factors should be considered together and in context, as in *Karelitz*, 820 F.2d at 532.  Among other things, four years elapsed from the identification of Incremental Audit Revenue; two years elapsed from Geist's last work under the Services Agreement; Clearwire changed ownership; HITN changed leadership; and market conditions allegedly greatly improved.   *See* SAC ¶¶ 46, 51, 53, 54, 59.   Such affirmative allegations undermining a causal link find no echo in Plaintiffs' cited cases.  *See Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 142 (1971) (sufficient evidence "to establish *a continuing connection*" over an 18-month period); *Seckendorff v. Halsey, Stuart, & Co.*, 234 A.D. 61 (N.Y. App. Div. 1931), *rev'd on other grounds*, 259 N.Y. 353, 357 (1932) (one-year lapse not dispositive where financing "flowed directly" from original effort).

HITN's opening brief demonstrated that, on Plaintiffs' theory, there is no upper limit on the amount of time that could elapse between Clearwire's rejected 2012 offer and a subsequent transaction to which Plaintiffs would ostensibly be entitled to a 10% share.  In response (at 25–26), Plaintiffs confirm that this extreme position is, in fact, the one they are asking this Court to adopt:  "Certainly, if a set of unforeseen circumstances came about that severed the 'continuing connection' required, this *might* create an intervening cause sufficient to cut off liability.  But the case law teaches that *the passage of time, in-and-of itself, is **not** sufficient* to do so" (bold emphasis in original, italics added).  That is a radical, and radically wrong reading of New York law.  What "the case law teaches," as relevant here, is that "a contract may not be interpreted to produce a

result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (N.Y. App. Div. 2010). Yet Plaintiffs' argument would generate just such a result: A world in which HITN intentionally gave RJG-MD a perpetual free option to a share of any transaction no matter how many years or decades into the future, with no downside to RJG-MD if its "plan" and the resulting "pause" wound up causing HITN to enter into a worse transaction than the one on the table in 2012.

*Second*, Plaintiffs fail to rebut HITN's showing that market movements broke the causal link. Plaintiffs not only concede the existence of the market movements—as alleged in the original Complaint, which attributed the 2016 Transaction to "substantially improved market conditions" that had reached their "zenith" (¶¶ 38, 40, 61)—but also *rely* on the market movement as a "prerequisite for completion of the deal," and "the triggering event." Opp. at 24 n.10. Those concessions confirm the absence of a continuing connection. *Fryling v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 593 F.2d 736, 743–44 (6th Cir. 1979) (no causation where market conditions responsible for losses); *In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*, 583 F. Supp. 1388, 1417 (E.D. Pa. 1984) (no proximate cause where "ebbs and flows of the stock market intervened").

### C. The Services Agreement Only Permits Payment As To Incremental Audit Revenue—Not Amounts Resulting From Such Revenue

Plaintiffs' entire argument concerning the meaning of Section 1(b)(iii) boils down to the mistaken contention that "Section 1(b)(iii) provides two separate payment prongs" (Opp. at 28): (1) one permitting a claim to 10% of incremental audit revenue, which all parties agree is stated in the primary, opening clause of the section, and (2) a supposed second prong permitting a claim to 10% of other payments, which Plaintiffs wrongly read into the "avoidance of doubt" clause. But there are not two prongs. As demonstrated above, a clause "for the avoidance of doubt" by

definition does not create new and separate obligations, but simply reiterates what came before. This disposes wholesale of Plaintiffs' various arguments (at 29) about superfluity.[5]

Plaintiffs' reading also fails because, as HITN showed (Br. at 24), "[t]he only provision regarding payment 'hereunder' is that providing a 10% share of Incremental Audit Revenue." Plaintiffs (at 30) respond that "'payment hereunder' in Section 1(b)(iii) simply refers to payment under the **10% regime established by that section**, *not* to only payment of 10% of Incremental Audit Revenue" (bold emphasis added, italics in original). The trouble with this argument is that the "10% regime established by that section," is nothing more than the first sentence of Section 1(b)(iii), which permits recovery of "10% *of Incremental Audit Revenue*." Opp. at 30 (emphasis added). There is no "regime" established in Section 1(b)(iii), or elsewhere in the Agreement, pursuant to which Plaintiffs could receive 10% of something other than Incremental Audit Revenue.[6] Plaintiffs' arguments about Geist's supposed intent fail for this reason, and those noted above (section I(C)).

Plaintiffs also argue that their interpretation "comports" with how the phrase "payment hereunder" is used in Section 1(c)(ii). Actually, Section 1(c)(ii) supports HITN, not Plaintiffs,

---

[5]   In any event, courts need not "mechanically interpret every [word]" in a contract so as to "give every term in [every] clause . . . a distinct meaning." *Kutten v. Sun Life Assurance Co.*, 759 F.3d 942, 945 (8th Cir. 2014) (citing *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 407 n.4 (2d Cir. 2009) (Sack, J., concurring) ("the rule against surplusage" should be "applied with a grain or two of salt.")).

[6]   This supposed "regime" is just a new name for the equally-fabricated "mechanism of payment" that Plaintiffs pressed in opposition to HITN's motion to dismiss the FAC. In reply at that stage, HITN observed that Section 1(b)(iii) does not identify a "mechanism of payment"' and that Plaintiffs' invention of the phrase could not create a contractual right where none exists. HITN Reply in Support of Motion to Dismiss FAC (Dkt. 35), at 14–15. What was true of the nonexistent "mechanism" is now true of the equally nonexistent "regime."

because it refers back to specific payment streams such as "lease payments over time," rather than to an unspecified "payment regime" that finds no support in the preceding text.[7]

## III.   THE IMPLIED COVENANT, DECLARATORY JUDGMENT, AND UNJUST ENRICHMENT CLAIMS DUPLICATE THE CONTRACT CLAIM

### A.   The Implied Covenant Claim Should Be Dismissed As Duplicative

HITN's opening brief (at 24–26) showed that Count IV should be dismissed because it is based on the same conduct and seeks relief identical to Plaintiffs' defective contract claims.  In response, Plaintiffs first argue that an implied covenant claim *might* exist where a party takes action to "deprive the other party of the fruit of its bargain."  But none of the cases Plaintiffs cite for that generic principle hold that such an allegation can overcome the clear bar on implied covenant claims that, like here, are (a) alleged based on precisely the same facts as a contract claim and (b) seek precisely the same relief.  *See* SAC ¶ 92 (claiming the same damages "as explained above in paragraphs 86–87 [of the contract claim]").

Plaintiffs do no better in arguing that HITN breached an implied duty by terminating the Services Agreement "in a *failed effort* to cut off its continuing liability under section (1)(b)(iii) of the Services Agreement." Opp. at 33 (emphasis added) (citing SAC ¶ 90).  If it is true that HITN "failed" to cut off its continuing liability under the actual terms of the contract, then Plaintiffs' remedy is a claim for breach of contract on account of that liability; on the other hand, if HITN *succeeded* in cutting of its continuing liability under the actual terms of the contract, then Plaintiffs have no claim either, because HITN was entitled to exercise its contractual right to terminate.  *See*

---

[7] Section 1(c)(ii) also supports HITN because it shows that when the parties anticipated the possibility of ongoing payment streams to RGD-MD over time, they explicitly addressed issues such as whether to require a "net present value [payment]."  The fact that the parties did not address those issues in Section 1(b)(iii)—which instead deals with issues such as the extent to which RJG-MD would be paid if incremental audit revenue was incorporated into a new transaction—further confirms that RJG-MD was not to receive ongoing payment streams under that Section, but rather just a one-time payment for audit revenues Geist identified and HITN recovered.

*Triton Partners LLC v. Prudential Sec. Inc.*, 301 A.D.2d 411, 411 (N.Y. App. Div. 2003) ("[A] party has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause without court inquiry into whether the termination was activated by an ulterior motive.").  Because the Services Agreement contains an entire clause granting HITN the right to terminate, and addressing how such termination would (or would not) affect the parties' rights, Plaintiffs cannot obtain a different outcome through an implied covenant claim.  *See* Br. at 21; *see also Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) ("no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship'").

### B.   The Declaratory Judgment Claim Should Be Dismissed As Duplicative

HITN's opening brief demonstrated that Count V should be dismissed (a) because it is based on the same defective interpretation of the Agreement that dooms Plaintiffs' contract claim, and (b) because it is duplicative of the contract claim.  Plaintiffs' brief ignores the first issue and thereby concedes that if the Court dismisses the contract claim it must also dismiss the declaratory judgment claim.  As to the second issue, Plaintiffs argue that "the contract claim is meant to capture those payments *currently* due and owing to RJG, while the Declaratory Judgment claim will settle the parties' rights with respect to *future* payments under the [2016] Transaction."  Opp. at 34 (emphasis added).  That is wrong—the contract claim as alleged in the SAC explicitly seeks recovery of "*future payments* . . . as such payments come due [to HITN] during the course of the [2016] Transaction lease agreements."  SAC ¶ 86.  The claim, which is defective in both places, should be dismissed.

### C.   The Unjust Enrichment Claim Should Be Dismissed As Duplicative

Unable to identify a separate duty or factual distinction between its contract and unjust enrichment claims that would justify its alternative pleading, Plaintiffs assert (at 35) that a quasi-contract claim is proper where the "existence of a contract covering the subject matter is potentially

in dispute . . . ." But Plaintiffs have not identified a dispute as to the "existence" of an applicable contract—they merely dispute the *meaning* of the contract, and no law suggests that "disagree[ment]" (Opp. at 35) as to contractual meaning permits a duplicative quasi-contract claim. Such a rule would eviscerate the requirement that "a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract . . . ." *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 97 (2000); *id.* (rule is "settled law in Maryland, and elsewhere"). Plaintiffs' cited case, *U.S. ex rel All State Construction, Inc. v. SEI Grp., Inc.*, No. 14-0131, 2014 WL 3571980, at *1, 3 (D. Md. 2014), in which there was "disagreement" regarding whether extra-contractual work created *additional* implied-in-law contracts, is not to the contrary. Finally, Plaintiffs' assertion that an unjust enrichment claim can proceed "where the plaintiff alleges that the contracts were induced by fraud," (Opp. at 35) is of no help to them, because the SAC does not allege that the Agreement was induced by fraud. *See* Opp. at 35 (asserting with no SAC citation that there *may* have been "*potential* fraud").

## CONCLUSION

The Court should dismiss the SAC's third, fourth, fifth, and sixth causes of action with prejudice and without leave to amend.

Respectfully submitted,

 /s/ William Pittard
William Pittard, D. Md. Bar No. 16155
**KAISER DILLON PLLC**
1401 K Street, NW, Suite 600
Washington, DC  20005
Telephone:     (202) 683-6150
Facsimile:      (202) 280-1034
wpittard@kaiserdillon.com

Isaac Nesser, *pro hac vice*
Corey Worcester, *pro hac vice*
Serafina Concannon, *pro hac vice*

20

Anthony P. Marzocca, *pro hac vice*
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:      (212) 849-7000
Facsimile:      (212) 849-7100
isaacnesser@quinnemanuel.com
coreyworcester@quinnemanuel.com
serafinaconcannon@quinnemanuel.com
anthonymarzocca@quinnemanuel.com

Robert J. Becher, *pro hac vice*
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100
robertbecher@quinnemanuel.com

July 10, 2017              *Counsel for Defendant Hispanic Information and*
                          *Telecommunications Network, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on July 10, 2017, I caused to be filed via the Court's CM/ECF system the foregoing Corrected Reply Memorandum in Further Support of Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint, and I understand that the system caused service of that Memorandum on counsel for all parties to this action.

 /s/ William Pittard
William Pittard