IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| RUDOLPH J. GEIST, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. PX-16-3630 |
| | * | |
| HISPANIC INFORMATION & TELECOMMUNICATIONS NETWORK, INC., | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*

Pending in this action is a motion to dismiss Counts III, IV, V, and VI of Plaintiffs' Second Amended Complaint, filed by Defendant, Hispanic Information and Telecommunications Network, Inc. ("HITN"), ECF No. 43. The issues are fully briefed, and the Court now rules pursuant to Local Rule 105.6 because no hearing is necessary. For the following reasons, HITN's motion to dismiss is GRANTED in part and DENIED in part.

## I. Background

Plaintiff Rudolph Geist is the sole member and Managing Partner of Plaintiff RJGLaw LLC,[1] a limited liability company formed under the laws of the State of Maryland from July 2001 through February 2-15, now organized under the laws of the District of Columbia. ECF No. 41 at ¶¶ 3–5. Defendant Hispanic Information and Telecommunications Network, Inc. (HITN) is a non-profit media corporation that is incorporated and principally conducts business in New York. *Id.* at ¶ 6.

---

[1] RJGLaw Plaintiffs include two separate entities: Maryland Plaintiff RJGLaw LLC, a limited liability company formed under the laws of the State of Maryland from 2001 through 2015, and its successor-in-interest District of Columbia Plaintiff RJGLaw, LLC, formed under the law of the District of Columbia. ECF No. 43 at ¶¶ 4–5.

1

In the United States, radio frequencies are regulated by the Federal Communications Commission through the issuance of "spectrum licenses," which authorize a licensee to use a specific portion of the electromagnetic spectrum. ECF No. 1-1 at ¶ 7. Spectrum licensees often enter into "Individual Use Agreements" (IUAs) with third parties to authorize the third party's use of all or a portion of the holder's radio spectrum for commercial purposes. *See* ECF No. 41 at ¶¶ 7–8, 12; *see also* Service Agreement, ECF No. 1-1. Defendant HITN holds 90 Educational Broadband Service ("EBS") spectrum licenses, and leases these licenses through IUAs to third parties, including Clearwire Corporation and its affiliates (collectively, "Clearwire"). ECF No. 41 at ¶¶ 13 & 15.

On April 24, 2012, Plaintiffs, acting in the corporate capacity of RJGLaw, agreed to provide to HITN auditing, consulting, and spectrum acquisition services regarding HITN's relationship with Clearwire. *Id.* at ¶¶ 23–28. The terms of this agreement were memorialized in a written contract and signed by both parties ("Service Agreement"). *See* Service Agreement, ECF No. 1-1; *see also* ECF No. 41 at ¶ 25. The Service Agreement establishes the scope of Plaintiffs' work and compensation. Some terms of payment and service length differ depending on whether Plaintiffs' work is classified as auditing, consulting, or spectrum acquisition. *See generally* ECF No. 1-1.

Plaintiffs' Second Amended Complaint alleges that around the time RJGLaw contracted with HITN in April 2012, HITN was negotiating with Clearwire to lease a spectrum license portfolio ("T2 Transaction"). ECF No. 41 at ¶ 18. As part of RJGLaw's contract with HITN, RJGLaw reviewed the terms of HITN's proposed agreement with Clearwire and advised them that Clearwire's present offer of $84,787,500 "vastly undervalued HITN's spectrum rights at issue in the transaction." *Id.* at ¶ 43–44. Nonetheless, Plaintiffs allege that HITN was prepared

to accept the offer because HITN "viewed closing of the T2 transaction as essential for the survival of the company" due to HITN's "dire financial condition at the time." *Id.* at ¶¶ 45. HITN's situation changed when RJGLaw discovered that Clearwire owed approximately $3 million to HITN for existing spectrum license leases. *Id.* at ¶¶ 65–68. Plaintiff further alleges that as a result of RJGLaw's advice regarding the true value of HITN's spectrum portfolio and audit discoveries, HITN paused the T2 Transaction negotiation "to hold out for a better deal in the future," and did not resume negotiation until 2014. *Id.* at ¶¶ 46, 47, 82.

RJGLaw worked for HITN under the Services Agreement through "at least October 2013," although there was a series of disagreements regarding outstanding payment to Plaintiffs for services rendered to HITN. ECF No. 41 at ¶¶50–51. At or around March 2014, HITN "demanded that [Plaintiffs] agree to an amended Services Agreement to reduce the compensation HITN would owe," and when Plaintiffs refused, HITN terminated the Services Agreement. *Id.* at ¶ 54.

In August 2016, HITN completed a spectrum lease agreement with Clearwire valued at approximately $267,000,000. *Id.* at ¶¶ 60–61. Plaintiffs allege that with the "exception of the price paid for the spectrum, the structure of the T2 Transaction was substantially identical to the T2 Transaction proposed in 2012." *Id.* at ¶ 61. The difference paid between the proposed 2012 transaction and final 2016 transaction is approximately $182,812,500. *Id.* at ¶ 62. Plaintiffs claim they have yet to be paid pursuant to the Services Agreement.

Plaintiffs filed suit on November 4, 2016. *See* ECF No. 1. On April 5, 2017, with the leave of the Court, Plaintiffs filed a Second Amended Complaint, asserting seven claims premised on breach of contract (Counts I & III), breach of duty of good faith and fair dealing (Count IV), declaratory judgment (Count V), and unjust enrichment (Count VI). ECF No. 41.

Defendant then moved to dismiss all claims related to the T2 Transaction (Counts III, IV, V, and VI) under Federal Rule of Civil Procedure 12(b)(6). ECF No. 43.

## II. Standard of Review

When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). In addition to the complaint, the court "may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *see also Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Here, Plaintiffs' Complaint attaches and incorporates the Service Agreement; because the agreement aids in resolving the motion, the Court will consider it. *See* ECF No. 1-1.

## III. Analysis

### a. Choice of Law

Because this case is brought pursuant to this Court's diversity jurisdiction, Maryland's choice of law rules apply. *See Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999) ("A federal court sitting in diversity must apply the choice-of-law rules from the forum state."). In Maryland, it is "generally accepted that the parties to a contract may agree as to the law which will govern their transaction." *Kronovet v. Lipchin*, 288 Md. 30, 43 (1994). The parties' choice of law is to be honored unless, "1) the state whose law is chosen has no substantial relationship to the parties or the transaction; or 2) the strong fundamental public policy of the forum state precludes the application of the choice of law provision." *American Motorists Ins. Co. v. ARTA Group, Inc.*,

338 Md. 560, 572 (1995). These principles also generally apply to contract-related tort claims, including unjust enrichment and breach of the implied covenant of good faith and fair dealing. *See View Point Medical Systems, LLC v. Athena Health, Inc.*, 9 F. Supp. 3d 588, 599, 606–07 (D. Md. 2014); *Ademiluyi v. Pennymac Mortgage Investment Trust Holdings, et al.*, 929 F. Supp. 2d 502, 513 (D. Md. 2013) ("Maryland's choice of law for an unjust enrichment claim follows the choice of law for a contract claim.").

The Services Agreement provides that it "shall be construed in accordance with the substantive law of New York." ECF No. 1-1 at § 7(d). Because the parties agree that the Services Agreement governs the parties' dispute, and do not argue that its choice of law provision is unenforceable, the Court will apply New York law. *See id.*; *see also* ECF Nos. 41 & 43-1.

### b. Count III (Breach of Contract)

To prevail on any breach of contract claim under New York law, a plaintiff must plead (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages attributable to the breach. *See Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21–22 (2d Cir. 2011). Where the contract terms clearly and unambiguously establish that no breach occurred, the Court may dismiss the claim at the 12(b)(6) motion to dismiss stage. *See, e.g., Advanced Mktg. Group, Inc. v. Bus Payments Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008); *see also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992).

A contract's language is unambiguous if the disputed terms have "a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010) (quoting *Hunt Ltd. v.*

5

*Lifschultz Fast Freight, Inc.*, 889 F.3d 1274, 1277 (2d Cir. 1989). While the Court is "not obliged to accept the allegations of the complaint as to how to construe [the contract]," any ambiguities must be read favorably to the plaintiff at the motion to dismiss stage. *Subaru Distrib.*, 425 F.3d at 122.

Section 1(b)(iii)(b) of the Service Agreement binds HITN to pay Plaintiffs ten percent of any "additional payments" made to HITN where such payments were: 1) "not proposed or agreed prior to the date hereof pursuant to agreements resulting from current negotiations;" (2) "in forms other than those intended under original IUAs and other current agreements between HITN and Clearwire;" and (3) "a consequence of the identification by Geist of Incremental Audit Revenue." *See* Services Agreement, ECF No. 1-1 at § 1(b)(iii); ECF No. 41 at ¶¶ 79-82; *see also* ECF No. 47 at 6. Plaintiffs allege that HITN's refusal to pay Plaintiffs ten percent of the difference in value of the 2016 T2 Transaction between HITN and Clearwire is a breach of § 1(b)(iii) because without Plaintiffs' identification of Incremental Audit Revenue in 2012, HITN would have entered into a substantively identical, but considerably less profitable, agreement with Clearwire. *See* ECF No. 41 at ¶¶ 79–82. HITN, in turn, contends that the "plain language of the parties' contract" precludes Plaintiffs' interpretation of the ten percent provision in § 1(b)(iii), and that Plaintiffs cannot plausibly establish a breach of the Services Agreement. ECF No. 43-1.

The interpretation of the disputed terms largely centers on the import of the phrase "for the avoidance of doubt" used in § 1(b)(iii). Section 1(b)(iii) reads in its entirety:

> iii. *Payment*. If, as and when there is a payment to HITN in respect of any Incremental Audit Revenue that was identified by Geist, Geist shall be entitled to payment of ten percent (10%) of the amount of such incremental Audit Revenue within ten days after payment thereof is made to HITN. **For the avoidance of doubt**, (a) the increase in payments under existing IUAs presently being negotiated with Clearwire are not Incremental Audit Revenue and (b) Geist shall not be entitled to payment for Consulting

> Services in respect of work performed in respect of Audit Services; provided that, if HITN received additional payments from Clearwire that have not been proposed or agreed prior to the date hereof pursuant to agreements resulting from current negotiations, and such additional payments are in forms other than those intended under original IUAs and other current agreements between HITN and Clearwire, but such payments are a consequence of the identification by Geist of Incremental Audit Revenue, then Geist shall be entitled to payment hereunder for the additional payments received by HITN.

*See* Services Agreement, ECF No. 1-1 at § 1(b)(iii).

HITN argues that because the term "for the avoidance of doubt" traditionally signals clarifying language as to previously articulated terms, the provision beginning with "provided that…" is not a separate, enforceable payment prong. *See id.* at 15–16. Generally, the plain meaning of the phrase "for the avoidance of doubt" is to clarify earlier language. *See, e.g. In Re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1059 (Del. Ch. 2015) ("As indicated by the prepositional phrase, 'for the avoidance of doubt,' the language [following] is confirmatory."). However, courts must "adopt an interpretation which gives meaning to every provision of a contract;" and "no provision of a contract should be left without force and effect." *McQuade v. McQuade*, 889 N.Y.S.2d 247, 249 (N.Y. App. Div. 2009) (quoting *Muzak Corp v. Hotel Taft Corp.*, 150 N.Y.S.2d 171, 174 (2009)).

The language following "for the avoidance of doubt" clause introduces terms not found elsewhere in Section 1(b). Specifically, whereas all other language in Section 1(b) applies to only then-existing agreements with Clearwire, *see* 1(b)(i)[2] *and* 1(b)(iii),[3] the terms following "for

---

[2] "Geist's audit services include advising on those aspects of the Clearwire Relationships that could generate additional revenue to HITN if actual payments to HITN have not *reflected the amount required to be paid pursuant to the contractual formula or terms set forth* in a particular IUA or other operative agreement with Clearwire *within ten days after any such payment should have been paid* to HITN ("Incremental Audit Revenue"). ECF No. 1-1 at 1(b)(i).

[3] "If, as and when there is a payment to HITN in respect of any Incremental Audit Revenue that was identified by Geist . . . ." *Id.* at § 1(b)(iii); *see also* 1(b)(i) (defining Incremental Audit Revenue as "actual payments [that] have not reflected the amount required to paid pursuant to the contractual formula or terms set forth in a particular IUA or other operative agreement with Clearwire within ten days after any such payments should have been paid to HITN.").

7

the avoidance of doubt" clearly apply to *future* agreements. *See* Section 1(b)(iii) ("if HITN receives additional payments from Clearwire that have not been proposed or agreed prior to the date hereof pursuant to agreements resulting from current negotiations . . . [and] in forms other than those intended under original IUAs and other current agreements . . . then Geist shall be entitled to payment hereunder."). As such, the language following "for the avoidance of doubt . . ." cannot be a clarification of other contractual terms in this instance, and the Court must accord the provision independent meeting. *See Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (holding courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (internal citation omitted).

HITN also argues that the overall structure of the Services Agreement prohibits Plaintiffs' interpretation of § 1(b)(iii). The Services Agreement is divided into three sections: 1(a) Consulting Services and Related Compensation; 1(b) Audit Related Services; and 1(c) Spectrum Acquisition Services. Section 1(a), "Consulting Services," dictates the scope and compensation owed for Plaintiffs' time "reviewing and advising on particular aspects of the Clearwire Relationships and in particular the documentation of those relationships in the form of the IUAs and related agreements." Services Agreement, ECF No. 1-1 at § 1(a)(i). HITN argues that to the extent RJGLaw rendered advice about the 2012 T2 Transaction negotiations, RJGLaw was compensated under this section, which provides $400 per hour for consulting services. ECF No. 43-1 at 11.

HITN's "consulting services" argument does not compel dismissal of Plaintiffs' breach of contract claim because it is unsupported by the facts averred in the Second Amended Complaint and the plain language of the Services Agreement. The Second Amended Complaint

8

avers that "as part of RJGLaw's *audit services,* Mr. Geist reviewed and performed an analysis of the current negotiations of the T2 Transaction." ECF No. 41 at ¶ 32 (emphasis added). Further, HITN's interpretation requires the Court to infer facts not alleged by the Second Amended Complaint or HITN, namely that HITN "specifically requested in writing" for RJGLaw to review the proposed T2 Transaction "on its behalf," as required for all "consulting services" under the Services Agreement. *Compare* Services Agreement, ECF No. 1-1 at 1 *with* ECF Nos. 41 & 43-1 at 11. Finally, and perhaps most critically, the Services Agreement directs that "[t]he section headings in this Agreement are inserted for purposes of convenience of reference only and shall not affect the meaning or interpretation of this Agreement." ECF No. 1-1 at § 7(c). Accordingly, the Court cannot grant the placement of the disputed provision under "Audits" rather than "Consulting Services" the weight that Defendant accords it when considering the propriety of dismissal.

Perhaps in recognition that the "plain language" arguments would not carry a 12(b)(6) motion, HITN also argues that even if § 1(b)(iii)(b)'s "provided that . . ." provision is an independent payment obligation, Plaintiffs nevertheless fail to state a claim. *See* ECF No. 43-1 at 13–23. To this end, HITN argues that the Second Amended Complaint fails to show that the payments from Clearwire to HITN qualify under § 1(b)(iii) because these payments were "in forms other than those intended under original IUAs and other current agreements" and "a consequence of the identification by [RJGLaw] of Incremental Audit Revenue." *See* ECF No. 43-1 at 13–23; *see also* Services Agreement, ECF No. 1-1 at §1(b)(iii). The Court disagrees.

As an initial matter, the meaning of "forms other than those intended" is neither clear nor unambiguous on the face of the Services Agreement. *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010) (noting that "when the language of a contract is ambiguous, its

9

construction presents a question of facts, which of course precludes summary dismissal on a Rule 12(b)(6) motion.")(internal citation omitted). But even if these terms were clear, Plaintiffs have averred sufficient facts to survive a motion to dismiss. Plaintiffs allege that the payments received by HITN for the final T2 Transaction "are in forms other than intended under the Original IUAS and other current agreements . . .[s]pecifically, the forms of the additional payments HITN received in the final T2 transaction consist solely of an upfront cash payment, regular fixed monthly lease payments, and some periodic lump sum payments." ECF No. 41 at ¶ 61. While Defendants argue that these averments are a "conclusory half-sentence," ECF No. 43-1 at 14, the Court views the matter differently at the dismissal stage. Such pleading is certainly sufficient for the claim to survive.

Turning to whether the T2 Transaction was "a consequence of the identification by RJGLaw of Incremental Audit Revenue," HITN urges the Court to read this provision as requiring RJGLaw's work to be a *proximate cause* of the T2 Transaction. *See* ECF No. 41 at ¶¶ 46–49, 62; ECF Nos. 43-1 at 18–19 & 49 at 13–16. The Court agrees with the general proposition that as a matter of law, proximate causation is required to establish damages in a breach of contract claim. *See* ECF No. 43-1 at 17. The central question at this stage, however, is whether the terms of the Services Agreement clearly and unambiguously *compel* dismissal of Plaintiffs breach of contract claim. That inquiry requires this Court to not "add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *See Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001). But this is precisely what HITN is asking the court to do.

HITN's argument depends on interpreting the term "consequence" inconsistently with the plain language of the Services Agreement and common understanding of the word. A

consequence, according to Black's Law Dictionary, is "[a] result that follows as an effect of something that came before." *Consequence*, Black's Law Dictionary (10th ed. 2014). Similarly, Merriam Webster defines consequence as "something produced by a cause or necessarily following from a set of conditions," noting by way of illustration that "[t]he decrease in sales was *a consequence* of some bad publicity about the company." *Consequence,* Merriam-Webster.com, www.merriam-webster.com/dictionary/consequence (accessed Mar. 1, 2018) (emphasis added).

"Proximate consequence," by contrast, is separately defined in Black's as "[a] result following an unbroken sequence from some event, esp[ecially] one resulting from negligence." *Proximate consequence*, Black's Law Dictionary (10th ed. 2014). To read the term "a consequence" as HITN suggests would add to and thereby distort the plain meaning of the term "a consequence" as used in the Services Agreement. Thus, at the dismissal stage where all questionable contract terms are read in favor of the Plaintiffs, the Court cannot adopt the interpretation of "consequence" urged.[4] The Court will not dismiss the claim on this ground.

---

[4] For this proposition, HITN directs the Court to *Libby, McNeill & Libby v. U.S.*, 115 Ct. Cl. 290 (1950) (*affirmed by Libby, McNeill & Libby v. U.S.*, 340 U.S. 71, 72 (1950)), in which the Court of Claims was asked to interpret the meaning of a WWII era maritime insurance contract that did not cover damages to a merchant ship arising from "all consequences of hostilities or warlike operation." 115 Ct. Cl at 294. The court limited its analysis to "warlike operations" that were the *proximate cause* of the disputed losses, reasoning that in entering into a contract, the parties "were writing of legal consequences resulting from legal causes . . . [and] the mere fact that event B would have happened 'but for' the happening of event A does not make A the legal cause of B nor the legal consequence of A." *Id.* at 312–313; *see also Standard Oil Co. of New Jersey v. U.S.*, 340 U.S. 54 (1950). The court also grounded its analysis in the "intention of the parties" because if insurance policies truly excepted *all* consequences of hostilities, no matter how attenuated, insurance companies would get "its premium for carrying substantially no risk." *Libby*, 115 Ct. Cl. at 318. Defendant presents *Libby*'s holding as standing for the legal principle that the "common law definition of causation" must be "applied to contractual provisions concerning 'consequences.' " ECF No. 43-1 at 17–18. However, *Libby* has not been cited by a *single court* for this broad proposition, and its legacy is largely limited to wartime insurance policies. *See, e.g. Airlift Intern., Inc. v. U.S.*, 335 F. Supp. 442, 446 (S.D. Fl. 1971). The Court declines to apply *Libby* to require reading into a contract limiting principles that do not exist based on the plain and ordinary meaning of the contract terms.

Finally, HITN argues that the term "provided that" in §1(b)(iii) does not apply to Plaintiffs' role in the T2 Transaction because the provision also states that RJGLaw is "entitled to payment hereunder for the additional payment received." Services Agreement, ECF No. 1-1 at §1(b)(iii). "Payment hereunder," HITN argues, is limited to the earlier stated terms of "payment of ten percent (10%) of the amount of such Incremental Audit Revenue," and the T2 Transaction was not Incremental Audit Revenue. *See* ECF No. 43-1 at 22–24; *see also* ECF No. 1-1 at §1(b)(iii). However, as noted above, §1(b)(iii) undoubtedly contemplates not just RJG's identification of Incremental Audit Revenue – which by definition pertains to past agreements[5] – but also includes *consequences* stemming from that identification. *See* Services Agreement, ECF No. 1-1 at § 1(b)(iii). This inherent conflict between terms renders the provision's import ambiguous, which at this stage must be construed in favor of Plaintiffs. Accordingly, HITN's motion to dismiss Count I is DENIED.

### c. Count III (Breach of the Implied Covenant of Good Faith and Fair Dealing)

HITN urges dismissal of Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing because the claim is based on the same conduct as the contract claim and seeks the same relief, and attempts to import "implied" obligations contrary to the express obligations as set forth in the Services Agreement. To state a claim under the implied covenant of good faith and fair dealing, "the plaintiff must allege facts which tend to show that defendant sought to prevent performance of the contract or to withhold its benefits from plaintiff." *Symquest Group, Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 266 (E.D.N.Y. 2016) (quoting *House of Diamonds v. Borgioni*, 737 F. Supp. 2d 162, 170 (S.D.N.Y. 2010)). "[W]here the relief sought is 'intrinsically tied to the damages resulting from the breach of the contract,' there is no

---

[5] *See* 1(b)(i) (defining Incremental Audit Revenue as "actual payments [that] have not reflected the amount required to paid pursuant to the contractual formula or terms set forth in a particular IUA or other operative agreement with Clearwire within ten days after any such payments should have been paid to HITN.").

separate and distinct wrong that would give rise to an independent claim," and it must be dismissed. *ARI & Co., Inc., v. Regent Intl. Corp.*, 522 (S.D.N.Y. 2003) (internal citations omitted); *see also Nahabedian et al. v. Intercloud Systems, Inc., et al.*, No. RA-15-669, 2016 WL 155084, at *3 (Jan. 12, 2016 S.D.N.Y.)

Plaintiffs plead somewhat different facts supporting this allegation from those averred for breach of contract. Namely, Plaintiffs allege that HITN's termination of the Services Agreement in 2014 was a bad faith attempt to deny Plaintiffs benefits owed under § 1(b)(iii) in the event that the T2 Transaction was finalized. *See* ECF No. 41 at ¶ 90. However, damages – the ten percent of HITN's additional revenue from the T2 Transaction – are the same for both causes of action. Because Plaintiffs fail to identify any additional damages apart from those pled for breach of contract, Count III must be dismissed. *See Nahabedian*, No. RA-15-669, 2016 WL 155084, at *3.

### d. Count V (Declaratory Judgment)

In Count V, Plaintiffs seek "a declaration that [Plaintiffs] are entitled to receive 10% of the payments HITN receives going forward as a result of the T2 Transaction above what HITN would have received had it closed on the T2 Transaction as proposed in 2012." ECF No. 41 at ¶¶ 93–95. They argue declarative relief is necessary to "clarify the parties obligations" because the T2 Transaction's structure necessitates future payments from Clearwire to HITN, and under the Services Agreement, RJGLaw is to receive is 10% of all payments. *Id.* & ECF No. 47 at 34.

HITN urges the Court to dismiss this claim because it "duplicates the contract claim." *See* ECF No. 43 at 26. HITN is correct. Declaratory judgment is appropriate where an actual case or controversy exists, and the declaratory relief sought would clarify or settle the legal issues involved, finalize the controversy, and offer relief from uncertainty. *Amusement Indus.,*

*Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010). Accordingly, where the same conduct underlies claims for declaratory judgment and breach of contract, "courts generally dismiss the declaratory judgment claim as duplicative in favor of 'the better or more effective remedy' of 'the underlying litigation itself.' " *Dorset Industries, Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 403 (E.D.N.Y 2012) (quoting *Amusement Indus.*, 693 F. Supp. 2d at 311–12); *see also Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006) (holding that to the extent a declaratory judgment claim "seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action . . . the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action."). Here, Plaintiffs have not identified any additional relief that declaratory judgment would accord the parties not also achieved by resolving of the breach of contract claim. Whether under the Services Agreement Plaintiffs are owed payments made under the T2 Transaction to date will also govern whether HITN will owe similar future payments arising from the T2 Transaction. Declaratory relief, therefore, is improper and Count V is dismissed.

   **e. Count VI (Unjust Enrichment)**

  In New York, "[t]he basis of a claim for unjust enrichment is that the defendant obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff.'" *Corsello v. Verizon New York, Inc.*, 18 N.Y. 3d 777, 790 (2012). "A claim for unjust enrichment is normally proper only in the absence of an express agreement between the parties . . . [and] is not available where it simply duplicates, or replaces, a conventional contract claim." *Digizip.com v. Verizon Services Corp.*, 139 F. Supp. 3d 670, 682 (S.D.N.Y. 2015); *see also Corsello*, 18 N.Y.3d at 790 (2012) ("[U]njust enrichment is not a catchall cause of action to be used when others fail.").

Here, it is undisputed an express written agreement exists between the parties that governs the scope of their business relationship. *See* Nos. 41 & 43. Further, as in the contract claim, Plaintiffs' unjust enrichment claim is wholly premised on HITN's failure to compensate Plaintiffs for their alleged role in the T2 Transaction pursuant to the terms of the Services Agreement. *See* ECF No. 41 at ¶ 99 ("HITN did not compensate RJGLaw and Mr. Geist for the value of the services he provided . . . as promised."); *see also* ECF No. 41 at ¶ 100 (calculating damages for unjust enrichment as "an amount to be determined at trial, but not less than $18,483,250.").

Plaintiffs urge that the unjust enrichment claim should not be dismissed because "a claim for unjust enrichment is not duplicative of a breach of contract claim where the plaintiff alleges that the contracts were induced by fraud," *see* ECF No. 47 at 34–35. But this argument carries little weight. Allegations of fraud must be pleaded with particularity. *See* Federal Rule of Civil Procedure 9(b). The Second Amended Complaint, however, gives no factual basis for asserting that the Services Agreement was induced by fraud. *See* ECF No. 41. Accordingly, Plaintiffs' claim for unjust enrichment is duplicative and the motion to dismiss Count VI is GRANTED.

**IV. Conclusion**

For the foregoing reasons, Defendant HITN's motion to dismiss Counts III, IV, V, and VI is GRANTED in part and DENIED in part. A separate Order follows.

| _3/6/2018_ | _/s/_ |
|---|---|
| Date | Paula Xinis |
| | United States District Judge |

15